JERNIGAN, BANK COMMISSIONER, *v.* LOID RAINWATER CO.

4-4966

Opinion delivered May 23, 1938.

*Jack Holt,* Attorney General, *John P. Streepey,* Assistant, and *G. B. Segraves, Jr.,* for appellant.

*E. R. Parham* and *Taylor Roberts,* for appellee.

SMITH, J. On June 10, 1937, appellee filed with the Securities Division of the State Banking Department an application for a license to operate as a loan broker pursuant to act 135 of the Acts of 1937, p. 467.

In denying the application the following finding of fact was made:

"Applicant proposed to make loans to borrowers at a rate of interest not to exceed ten per cent. per annum, and in addition thereto the applicant or loan broker will require the borrower to take an insurance policy with the United Mutual Life Insurance Company of Indianapolis, Indiana, an insurance company designated by the loan broker, and for which insurance company the loan broker is agent, adding the amount of the annual premium for the insurance to the loan. The minimum amount of insurance required to be purchased by the borrower is $1,000, regardless of the amount of the loan, and in certain instances the loan broker requires that the borrower execute an additional note for a second annual premium. The loan broker, being the agent for the insurance company, receives the agent's commission for writing the insurance for the borrower, in addition to the interest charged. The insurance is not written to cover or protect the amount of the loan, or to cover the period of time for which the loan is made, but is merely a requirement made by the loan broker in order that he may receive an amount of money in excess of the ten per cent. interest charged. The borrower is required to pay, in addition to the interest charged, an insurance premium, certain other fees and expenses, such as fee for credit report, inspection and appraisal charges, fee for preparation of papers, and filing fees and expenses in connection with mortgages.

"The above requirements with reference to insurance and other expenses are absolute, and the loan broker will not make the loan unless the insurance is purchased by the borrower from the insurance company, and the name of the company being designated in the application for a license to engage in business as a loan broker. The loan broker advertises and represents to the public that

he is in the loan brokerage business only, and no thought of insurance is in the mind of the borrower until he arrives at the office of the loan broker. After the borrower has been solicited and calls at the office of the loan broker to secure a loan, he is then notified that he will be required to purchase the insurance before he can secure the loan. The applicant states that he does not advertise, or make any reference to the insurance requirements, before a prospective borrower applies for a loan, because to do so would deter borrowers from applying for loans and would have a detrimental effect on his loan business.''

Appellee appealed from this order to the circuit court of Pulaski county, where the order denying appellee a license was reversed and the Bank Commissioner was directed to issue a license as prayed, and this appeal is from that order and judgment.

The accuracy of the finding above recited does not appear to be questioned. Indeed, it is based upon appellee's own testimony as to the manner in which he has operated his loan business and proposes to continue. The briefs discuss at length the question whether appellee's plan results in the exaction of usurious interest. If it did, this, of itself, would justify and fully support the refusal to grant a license; but it is not essential that this finding be made to support the action of the banking department.

Section 22 of this act 135, *supra*, states the grounds upon which a license granted may thereafter be revoked, and among other grounds upon which that action may be taken is that the licensee ''. . . is making any charges for any services in connection with any financial transactions covered by this act which services were not actually rendered, or at rates which are exorbitant when considered in connection with the services rendered, or for services not reasonably required in connection with such transaction.'' It is apparent that conduct which would justify the revocation of a license to do business would justify the refusal to issue a license in the first instance.

The manner of appellee's operations, as appears from his own records and testimony, is as follows: Only one loan in excess of $500 was made. This was to one Vittilow. He borrowed $526.94, and executed his note for $907.32. There were, altogether, 47 borrowers, who received the aggregate amount of $3,091.81, and gave notes aggregating $6,816.59. One Wilson borrowed $25, and gave a note for $54.71. One Massey borrowed $25, and gave his note for $61. One Kortke borrowed $20, and gave a note for $49.56. One Shirley borrowed $30, and gave a note for $66.55. No one could borrow any sum of money without taking life insurance for the minimum amount of $1,000. It was not required that any insurance policy be assigned as security for the loan made, and it is obvious that this was not the purpose of taking out the insurance, as the policies bore no just proportion to the sum of money loaned. The examining officer of the banking department was fully justified in concluding that so much of each note as was in excess of the sum loaned was not reasonably required in connection with such transaction, and, if this be true, just reason existed, not only to refuse to issue a license, but to cancel one which had been issued. The inference is fairly deducible that it is not insurance which the borrowers want, but that their need for the small loans made them is such that they accept these loans on any terms that may be imposed. It must be true that many of these borrowers do not want insurance, and are not able to carry it, and they have no intention of doing so beyond the period of time covered by the premium which becomes a part of the notes they signed. This is not a service reasonably required in connection with the transaction, as it furnishes no security for the service rendered and the loan made.

It does not appear, from the record before us, what per cent. of the premium which becomes a part of the borrower's note, belongs to appellee as the agent of the insurance company, but it is shown what sum was borrowed and what premium was charged. For instance, in the case of Kortke he borrowed $20 and gave a note

for $49.56, of which amount $27.20 was for the insurance premium. It is a matter of common knowledge that a large, if not the greater, part of this first premium is paid to or retained by the agent who writes the insurance.

It is argued on behalf of appellee that the insurance is worth what it costs, and that no more is charged these borrowers than is charged others who take out similar insurance. This may be true, but the fact cannot be disguised that it is not insurance which the borrower wants. His pressing need is for a small loan, which he accepts upon any terms that may be imposed, and it is no service to the borrower to require him to take something he may not want and can ill afford to have, but which he accepts because his necessity permits no alternative.

Section 3 of the act 135 requires the Securities Division of the Banking Department to make investigation before granting a license and to issue a license ''If such investigation warrants the belief that said business will be operated honestly, fairly, and efficiently,'' and a bond in proper form is given and approved. Appellee's honesty is not questioned, nor is his efficiency, but it has been found that his plan of operation is not fair to the hapless borrower with whom he proposes to deal.

The act clothed the Securities Division of the Banking Department with a discretion in making this investigation and determination, and the preamble of the act recites the conditions which induced its enactment. It is there recited that ''. . . whereas the constitutional inhibition (against exacting usurious interest) has been systematically and consistently flouted by money lenders who have perpetrated the grossest abuses in contracting and collecting small loans from necessitous borrowers whose poverty and need enabled the lender to extort unconscionable rates of interest, . . .'' The obvious purpose of this legislation, read in the light of this preamble, was to protect a class of citizens who are unable to protect themselves, and to impose upon a Department of the State Government the duty of determining whether a person proposing to deal with this class would do so fairly.

It must be remembered that the duty imposed by law of investigating and determining whether a license should be granted or refused is not imposed upon this court nor upon the learned judge from whose order this appeal comes. He, in the first instance, and we, upon appeal, may review this action to determine whether there has been an arbitrary decision, or an abuse of discretion, but we should regard and uphold the decision of the Securities Division of the State Banking Department unless it be made to appear that there was an abuse of discretion or an arbitrary decision. *St. Louis S. W. Ry. Co.* v. *Stewart,* 150 Ark. 586, 235 S. W. 1003; *Rural Special School Dist.* v. *Common School Dist.,* 183 Ark. 329, 335, 35 S. W. 2d 587; sections 170 and 171, chapter Public Officers, 22 R. C. L. 490; sections 290, 291 and 293, chapter Officers, 42 C. J. 1033.

Among the cases cited for the affirmance of the judgment of the court below are those of *Cheairs* v. *McDermott Motor Co.,* 175 Ark. 1126, 2 S. W. 2d 1111; *Hogan* v. *Thompson,* 186 Ark. 497, 54 S. W. 2d 303; and *Leavitt* v. *Marathon Oil Co.,* 186 Ark. 1077, 57 S. W. 2d 814. But the question involved in each of those cases was whether the loan in question was void as usurious. Here, the intent to exact usury would be a sufficient ground for refusing a license; but it is not the only ground upon which a license may be refused. If it be conceded that the contracts which appellee has made and proposes to make are not void for usury, yet it does not follow that we should reverse a decision of the Securities Division of the State Banking Department. That department is clothed with the duty, under § 22 of act 135 of 1937, of determining whether charges are proposed which are exorbitant when considered in connection with the service rendered or for service not reasonably required in connection with the transaction, and, in view of the facts herein recited, we have concluded that the finding and order of an administrative department which has passed upon this question should not be disturbed.

The constitutionality of the act 135 is not questioned, but its constitutionality is fully sustained by the numerous cases cited in the brief of the Bank Commissioner.

The judgment of the circuit court, directing the issuance of a license, will, therefore, be reversed, and that order quashed.

GRIFFIN SMITH, C. J., and HUMPHREYS, J., dissent.

GRIFFIN SMITH, C. J., (dissenting). The Pulaski circuit court found that an order of the securities division of the State Bank Department was void, and the Bank Department asks that we reverse the judgment.

The order in question was adverse to the application of Loid Rainwater for renewal of his license as a loan broker. It is as follows:

"Applicant proposed to make loans to borrowers at a rate of interest not to exceed ten per cent. per annum, and in addition thereto the applicant or loan broker will require the borrower to take an insurance policy with the United Mutual Life Insurance Company of Indianapolis, Indiana, an insurance company designated by the loan broker as agent, adding the amount of the annual premium for the insurance to the loan. The minimum amount of insurance required to be purchased by the borrower is $1,000, regardless of the amount of the loan, and in certain instances the loan broker requires that the borrower execute an additional note for a second annual premium. The loan broker, being the agent for the insurance company, receives the agent's commission for writing the insurance for the borrower, in addition to the interest charged. The insurance is not written to cover or protect the amount of the loan, or to cover the period of time for which the loan is made, but is merely a requirement made by the loan broker in order that he may receive an amount of money in excess of the ten per cent. interest charged. The borrower is required to pay, in addition to the interest charged, an insurance premium, certain other fees and expenses, such as fee for credit report, inspection and appraisal charges, fee for preparation of papers, and filing fees and expenses in connection with mortgages.

"The above requirements with reference to insurance and other expenses are absolute, and the loan broker will not make the loan unless the insurance is purchased

by the borrower from the insurance company, and the name of the company being designated in the application for a license to engage in business as a loan broker. The loan broker advertises and represents to the public that he is in the loan brokerage business only, and no thought of insurance is in the mind of the borrower until he arrives at the office of the loan broker. After the borrower has been solicited and calls at the office of the loan broker to secure a loan, he is then notified that he will be required to purchase the insurance before he can secure the loan. The applicant states that he does not advertise, or make any reference to the insurance requirements, before a prospective borrower applies for a loan, because to do so would deter borrowers from applying for loans and would have a detrimental effect on his loan business.''

The order declining to license appellee then proceeds to base its justification upon two conclusions—that the plan of operation constitutes a scheme or device to cover usurious interest charges, and that the business to be engaged in will not be fairly operated.

If the first conclusion is sound the judgment should be reversed, for usury is an evil denounced alike by our constitution, by statutory provisions, and by an unbroken line of court decisions.

Indeed, we may turn to Holy Writ for authority in support of this well-nigh universal rule of public policy: ''If thy brother be waxen poor, and fall into decay with thee, then thou shalt relieve him; yea, though he be a stranger, or a sojourner, that he may live with thee. Take thou no usury, or increase, but fear thy God, that thy brother may live with thee. Thou shalt not give him thy money upon usury, nor lend him thy victuals for increase.'' Lev. XXV, 35-37. Again: ''Thou shalt not lend upon usury to thy brother; usury of money, usury of victuals, usury of anything that is lent upon usury. Unto a stranger thou mayest lend upon usury, but unto thy brother thou shalt not lend upon usury.'' Deut. XXIII, 19-20.

The distinction between usury under Mosaic laws and usury as we know it today is that originally any charge for the use of money was called usury.

Our constitutional inhibition against usury is: "All contracts for a greater rate of interest than ten per centum per annum shall be void, as to principal and interest." Art. 19, § 13.

In Ruling Case Law, Vol. 27, p. 208, it is said that the elements of usury are: (1) A loan or forbearance either express or implied; (2) a loan or forbearance of money or of something circulating as such; (3) an understanding between the parties that the principal shall be repayable absolutely; (4) the exaction of a greater profit than is allowed by law; and (5) an intention to violate the law.

Decisions of this court hold that:

"The form of a contract is not material, and a contract will be held usurious if from all of the facts and circumstances in the case it appears that an intent existed at the time the contract was made to take and receive, by way of interest, a sum of money in excess of that allowed by law." *Habach* v. *Johnson,* 132 Ark. 374, 201 S. W. 286.

"Where a loan of money was made at the highest rate of interest, and the lender, contemporaneously with the contract and as part consideration of it, received part of a bonus paid by the borrower to a broker for procuring the loan, the loan is usurious." *Jones* v. *Phillippe,* 135 Ark. 578, 206 S. W. 40.

"There is no device or shift on the part of the lender to evade the statute against usury under or behind which the law will not look in order to ascertain the real nature of the transaction." *Dickinson-Reed-Randerson Co.* v. *Stroupe,* 169 Ark. 277, 275 S. W. 520.

In *Cheairs* v. *McDermott Motor Co.,* 175 Ark. 1126, 2 S. W. 2d 1111, the appellee sold an automobile for $667.81, but added $76 to the sale price for "insurance and carrying charges." It was sought to have the contract set aside as usurious. In an opinion written by Chief Justice HART affirming judgment of the Drew circuit court

presided over by Judge TURNER BUTLER, late an associate justice of this court, it was said: "The added charge was not a mere device to evade the statute against usury, but it represented the credit price of the car as distinguished from its cash price, and the circuit court properly held that the sale was valid and free from any taint of usury. The facts did not show this to be a case where property was sold at a cash valuation and certain payments were deferred in consideration that a greater rate of interest than allowed by law be paid by the purchaser. The transaction was neither a loan nor a forbearance of a debt, but was simply a contract to pay a greater sum for the purchase price of the automobile on a credit than would have been paid had the sale been for cash."

In the case before us it is not insisted that the rates of interest, as expressed in the notes, or the methods by which payments were to be made, would by mathematical computations show interest rates in excess of ten per cent. per annum. But for the purpose of tainting the transactions with usuary, appellant conclusively presumes that the profit appellee realizes as commissions on insurance premiums would necessarily swell the return beyond the legal maximum.

Appellee's business methods are illustrated by the following transaction: Vittilow executed his note for $907.32 and received $526.94 in cash. To the cash obligation was added interest of $45.36; also there was added an insurance premium of $335.02. These three items—$526.94, $45.36, and $335.02—equal the note. It is apparent that interest was charged at 5 per cent. on the total of $907.32. Yet, the fact remains that Vittilow borrowed $335.02 from appellee with which to pay his insurance premium. Appellee's financial return on this phase of the contract would be the net profit realized on his insurance business as a whole after "overhead" and other proper deductions had been made. It does not follow that because the premium was $335.02 appellee, as agent, profited to the full extent of the percentage of such premium he was permitted, under his contract with

the insurance company, to retain. The agent's commission is not shown.

The relationship of appellee's insurance business to the loan business is this: Of all items brought into the record, $3,991.87 in cash had been advanced to forty-seven individuals who executed notes for $6,816.59. Interest charges were $317.33 and insurance premiums were $2,510.15. Five per cent. interest on $6,816.59 would amount to $340.83. The rate of interest actually charged was 4.4 per cent.

The method applied by appellee in the Vittilow loan was to add the interest and charge interest on interest. If we deduct interest charges of $317.33 from total of the notes, the remainder is $6,499.26, and five per cent. of this amount is $324.96, or $7.63 less than a five per cent. average.

There is no suggestion that the insurance policies were not written in a standard, solvent company, or that premiums were increased by reason of the plan employed.

In *Hogan* v. *Thompson*, 186 Ark. 497, 54 S. W. 2d 303, J. P. Hogan borrowed $100 of Anne Thompson. The latter agreed to make the loan for six months at ten per cent. per annum, provided Hogan would purchase of the lender for $7.50 a $10 coupon to be used by the borrower in payment of merchandise sold by the Merchants' Coupon Service Company, represented by the lender. The deal was consummated and when payment of the note was demanded the borrower defended on the ground of usury. In the opinion, written by Mr. Justice BUTLER, we said: "Collateral contracts entered into contemporaneously with a contract for the lending and borrowing of money, where the collateral agreement is in itself lawful and made in good faith, will not invalidate the contract for the loan of money as usurious, although its effect might be to exact more from the borrower than the sum which would accrue to the lender from a legal rate of interest. This is based upon the principle that, since the law forfeits the entire loan and interest thereon for an exaction of usurious interest, however small, the intent to exact a usurious interest must be clearly

shown and will not be inferred where, from the circumstances, the opposite conclusion can be reasonably and fairly reached. . . . The $10 coupon which the appellee required the appellant to purchase as a condition precedent to her making the loan could be applied in payment at its face value upon the purchase price of any article of merchandise amounting to $40 or more purchased from the mercantile company. In the absence of a showing to the contrary, we must infer that the articles in which the mercantile company dealt were such as the company purported them to be, and the price for which they would be sold would be such as was usual and customary for such articles, and that they were worth the price demanded." See, also, *Leavitt* v. *Marathon Oil Company*, 186 Ark. 1077, 57 S. W. 2d 814; 27 R. C. L., § 31, p. 230.

In a statement of facts preceding the opinion in the McDermott Motor Company case, *supra*, it was said: "The items called 'insurance and carrying charge' were not for the forbearance of a debt, but were to cover the increased price of selling on credit. The loan of money did not enter into the transaction at all."

If all references to insurance premiums of $2,510.15 were eliminated from the instant case, and the interest charges aggregating $317.33 were computed solely on the actual money advanced, the result would be $81.85 less than a 10 per cent. average. The figures would be 7.9 per cent. Therefore, there was no usury.

Appellant, however, in addition to a finding that the contracts were usurious, ruled that the license should be withheld on the ground that appellee would not operate his business fairly.

If there is legal authority for appellant's order it must be found in act 135 of 1937, entitled, "An Act to Define, Regulate and License Loan Brokers and the Business of Loan Brokers in Amount of $500 or Less."

The preamble to act 135 recites that . . . "Money lenders have perpetrated the grossest abuses in contracting and collecting small loans. . . . Certain classes have regularly charged interest in excess of 160

per centum per annum. . . . [They] have reduced the borrower to a virtual state of peonage. . . . [They] have invaded the sanctity of the home by the insidious practice of soliciting and making loans to housewives without the knowledge or consent of their husbands. . . . [They] have harried unfortunate debtors by parading and cursing before their homes and causing outcry."

Section 1 of the act defines a loan broker as "A person, co-partnership, association or corporation who directly or indirectly, either as principal or agent, engages in the business of purchasing wages or salaries, or the business of lending money, or the business of negotiating or procuring advances of money, or the business of guaranteeing or indorsing notes and other evidences of indebtedness, in amounts of $500 or less."

Section 2 requires loan brokers to file with the securities division of the State Bank Department an application and bond and to obtain a license before entering into such business.

Section 11 provides: "If upon the investigation by the securities division . . . it shall be evident that the applicant is unfit through lack of financial responsibility, experience, or character to conduct the business of a loan broker, or if said bond shall not be acceptable, then said application shall be rejected."

The only other language relating to the right of the Bank Department to reject an application is found in subdivision "(b)" of § 22, which reads: "Said license may be suspended or cancelled [if] the licensee has violated any provision of this act or any rules and regulations lawfully made by the securities division of the State Bank Department, under and within the authority of this act or is making any charges for any services in connection with any financial transactions covered by this act which services were not actually rendered, or at rates which are exorbitant when considered in connection with the services rendered, or for services not reasonably required in connection with such transaction."

It is not alleged (a) that appellee is unfit through lack of financial responsibility; or (b) that he is unfit through lack of experience; or (c) that he is unfit for want of character. In each instance the facts are to the contrary. Nor is any question made as to sufficiency of the bond.

If the judgment should be reversed, therefore, authority for such procedure must be found in the subdivision of § 22, copied *supra*.

After summarizing appellee's methods the Bank Department found (1) that the business to be engaged in by applicant would not be conducted fairly; (2) that the contracts, agreements, and requirements to be made by applicant in connection with the making of loans would not be fair and equitable to borrowers and persons dealing with applicant, and (3) that such contracts, agreements, requirements, and plan of operation constitute a mere scheme or device to cover usurious interest and charges, in violation of act 135 of 1937.

Findings 1 and 2 are similar and reflect appellant's belief that the business will not be conducted fairly. The third finding is that the plan constitutes a cover for usury. This question has been disposed of.

There remains, then, the one proposition: Is appellant authorized under act 135 to refuse to license an applicant merely because, in the opinion of the Bank Department, an applicant will not conduct the business fairly?

Again adverting to the preamble to act 135 for the purpose of ascertaining the intent of the general assembly, to be drawn from the language used, we find the following: . . . "The profits from such traffic are an invitation to criminals to establish 'rackets' maintained by violent and unlawful acts and methods. . . . The abuses and acts mentioned have not been indulged in or resorted to by banks, trust companies, building and loan companies, industrial banks, credit unions, licensed pawnbrokers, rural credit unions, credit unions, agricultural and live stock pools, farmers' co-operative societies and commodity financiers as hereinafter defined."

The obvious, expressed purpose of the act was to prevent criminals from establishing "rackets" maintained by violent and unlawful acts and methods.

While the title of an act may be looked to for the purpose of ascertaining its meaning in connection with the enactment proper, it is no part of the act, and is not controlling. *Special School District No. 33* v. *Howard,* 124 Ark. 475, 187 S. W. 444; *Huff* v. *Udey,* 173 Ark. 464, 292 S. W. 693; *Conway* v. *Summers,* 176 Ark. 796, 4 S. W. 2d 19. The same rule is applicable to a preamble. *Oliver* v. *Southern Trust Company,* 138 Ark. 381, 212 S. W. 77.

In the instant case the practices directly inveighed against in the preamble to act 135 are not assigned as reasons for refusing to license appellee. Authority is vested in the Bank Department to refuse to license an applicant where the proof shows that such applicant is barred for any of the reasons enumerated in § 11 and subdivision "(b)" of § 22. The right is given to suspend or cancel a license if the party in question is . . . "making any charges for any services in connection with any financial transaction covered by act 135 which services were not actually rendered, or at rates which are exorbitant when considered in connection with the services rendered, or for services not reasonably required in connection with the transaction."

The meaning of the last expression is that unnecessary charges cannot be added to a contract under a pretext of incidental expenses if usury is thereby camouflaged, or if the purpose is to secure to the lender unearned returns. For the reasons herein expressed I think the judgment of the circuit court should be affirmed.

Mr. Justice HUMPHREYS concurs in this dissent.