CITY OF FT. SMITH *v.* SOUTHWESTERN BELL
TELEPHONE COMPANY.

4-9647                                          247 S. W. 2d 474

Opinion delivered February 18, 1952.

Rehearing denied April 7, 1952.

*R. A. Eilbott, Jr., Harrell Harper, Clyman E. Izard, Kaneaster Hodges, M. M. Little, O. D. Longstreth, Jr.,* and *Joseph Brooks,* for appellant.

*Blake Downie, Edward L. Wright* and *Ronald J. Foulis,* for appellee.

Ed. F. McFaddin, Justice. This appeal involves telephone rates. The appellants (hereinafter called ''Cities'') are the City of Fort Smith and nine other Arkansas cities,[1] which protest the rate increase made by the order herein involved. The real appellee is the Southwestern Bell Telephone Company (hereinafter called ''Southwestern'') which, by cross-appeal, seeks a greater rate increase than the one allowed. The Arkansas Public Service Commission (hereinafter called ''Commission'') is also an appellee, since this proceeding was prosecuted in the Circuit Court by petition to review the order of the Commission under § 73-233 Ark. Stats.

On August 21, 1950, Southwestern filed with the Commission certain rate schedules designed to increase Southwestern's annual Arkansas revenues by the sum of $4,600,000. The increased rates were to become effective on September 21, 1950. On August 22, 1950, the Commission suspended the said schedules, and on August 23rd, Southwestern filed with the Commission a bond to insure any refunds ordered; and accordingly the said proposed increased rates were put into effect on September 21, 1950. (See § 73-217 Ark. Stats.) Interventions and objections were filed by a number of cities[2] in Arkansas which are served by Southwestern.

Hearings commenced before the Commission on September 5, 1950, and, with various recesses, continued

[1] These are Benton, Earle, Heber Springs, Little Rock, Magnolia, Malvern, Paragould, Pine Bluff and Van Buren.

[2] The cities so intervening or objecting before the Commission were: Altheimer, Arkadelphia, Ashdown, Barling, Batesville, Beech Grove, Beebe, Benton, Bentonville, Camden, Conway, Dermott, El Dorado, Fayetteville, Forrest City, Fort Smith, Gurdon, Harrisburg, Heber Springs, Helena, Hope, Hot Springs, Jonesboro, Lonoke, Little Rock, Malvern, Marion, Mena, Mammoth Spring, McGehee, Newport, North Little Rock, Paragould, Pine Bluff, Rogers, Searcy, Springdale, Stamps, Van Buren, West Memphis and Wynne.

until November 28, 1950; and on January 20, 1951, the Commission issued its findings, and order here challenged.[3] On January 25, 1950, certain cities, including all the appellants, filed a petition for rehearing, and when such petition was denied by the Commission, the present ten appellant cities filed in the Pulaski Circuit Court on March 3, 1951, a petition for review of the Commission's order. Such is the procedure prescribed by § 73-233 Ark. Stats. Likewise, Southwestern filed with the Commission a petition for rehearing and later filed in the Circuit Court a petition for review. The Circuit Court, by judgment of July 5, 1951, dismissed the petitions for review of all of the parties; and this direct and cross-appeal ensued after proper motions for new trial were filed, both by the ten appellant cities and by Southwestern.

The record reflects that Southwestern is a Missouri corporation, and operates as a telephone public utility in the States of Missouri, Oklahoma, Kansas, Arkansas, Texas, and a portion of Illinois; that Southwestern is a subsidiary of, and wholly owned by,[4] American Telephone & Telegraph Company, which latter, having assets of over 10 billion dollars, is the largest corporation in the United States. American Telephone & Telegraph Company (sometimes herein called "American") owns in whole or in part, either directly or indirectly through its other subsidiaries like Southwestern, nineteen operating telephone companies, and supplies more telephone service than all the other telephone companies in the United States combined.

American owns 98.8% of the stock of Western Electric Company, which is the subsidiary that manufactures and sells telephone equipment to all the nineteen telephone companies controlled by American. American also controls the "Bell Telephone Laboratories", a research and development project, and has a "Long Lines

---

[3] See "Re: Southwestern Bell Telephone Co.," 87 Public Utilities Reports, New Series, page 97, for the complete opinion of the Commission.

[4] The record shows that 99.99% of the common stock of Southwestern is owned by American Telephone & Telegraph Company, and no common stock of Southwestern is traded in any stock exchange, and no common stock is available for purchase by the public.

Department'', which has the long distance lines that supply the wire and other facilities for calls from one city to another. American charges Southwestern a fee of 1% of its *gross revenue* for ''Supervision'', and fixes Western Electric's charges to Southwestern; and also, subject to Federal and State regulations, American determines the charges Southwestern pays to ''Long Lines Department''. It is apparent that American, through its affiliates, does not bargain with Southwestern at arm's length.

In proceedings before regulatory bodies to fix utility rates, it is axiomatic that the rate fixed must be fair to all concerned—*i. e.,* the public must not be overcharged, and the rate fixed must not be so low as to amount to a confiscation of the property of the utility. Somewhere between these two extremes—overcharge and confiscation—must be the rate to be fixed. But a tremendous factor in determining a rate depends on the method or methods used to calculate the investment of the utility. A most important factor, if not the prime one, is the so-called ''proper rate base'', which means the method used to determine the proper value of the property of the utility dedicated to, and actually employed in, the public use. In the case at bar, the Commission determined that: ''a proper rate base is the original or book cost, less the depreciation reserve''. To this figure, the Commission added amounts for what it considered necessary ''cash working capital'', and ''material and supplies'', and reached this calculation:

''Original Cost, December 31, 1950................$44,453,000.00
    Less Depreciation Reserve,
       December 31, 1950............................ 10,254,000.00

Net Plant Used and Useful,
       December 31, 1950............................ 34,199,000.00
Material and Supplies................................ 445,000.00
Cash Working Capital................................ 410,000.00

    Total Plant Account as of
       December 31, 1950............................ 35,054,000.00''

The next steps in the Commission's problem were, (1) to determine what net rate of return Southwestern

should have on its "rate base", and (2) to determine the increase in revenue necessary to yield such net rate of return. The Commission fixed 6% as the rate of return; and then, to determine the increase necessary to allow 6%, the Commission used this set of figures:

"Operating Revenues .......................................$14,102,000.00
Operating Expenses.................................. 11,907,000.00
Operating Taxes (Excl. Income Tax).......... 815,000.00

Total ......................................................... 12,722,000.00

Net Before Taxes....................................... 1,380,000.00
Income Taxes per Exhibit............................ 417,000.00

Adjustment for Increase in
   Federal Taxes...................................... 17,000.00

Total ...................................................... 434,000.00
Balance Available...................................... 946,000.00
6% Return on $35,054,000........................ 2,103,240.00
Less Balance Available............................... 946,000.00

Deficit in Net Operating Income..................... 1,157,240.00
Times 2.012194 equals Additional
   Revenue Necessary[5] ............................ 2,328,591.00

Add Revenue in Books from Sept. 21,
   1950, Account of Increase under Bond... 1,277,000.00
Total Increase Necessary............................ 3,605,591.00"

The effect of this last stated calculation was to allow Southwestern an increase of $3,605,591 per annum, instead of the $4,600,000 per annum which Southwestern sought. That is to say, Southwestern was allowed by the Commission to charge rates which would increase its gross revenue by the sum of $3,605,591.

The next and final step in the Commission's task was to put into effect a schedule of rates which would yield to Southwestern its present revenue, plus the increase of $3,605,591. That step in the proceedings is

[5] The item of $2,328,591 is obtained by multiplying the net operating deficit of $1,157,240 by 2.012194.

reserved for the final portion of this opinion, because the main questions now before us relate to the figures which were used to arrive at the designated increase of $3,605,591.

To the decision of the Commission allowing the increase of $3,605,591, the Cities claim the Commission erred in four points:

"1. Fixing the rate base as of December. 31, 1950, instead of September 30, 1950.

"2. Permitting the Southwestern Bell Telephone Company to back-bill for an initial period of one month when new rates became effective September 21, 1950.

"3. Allowing cash working capital in the sum of $410,000 when the Telephone Company collects its bills in advance.

"4. Allowing a rate of return of 6%, which is excessive and not supported by evidence, instead of 5%, which is the amount that should have been allowed."

To the failure of the Commission to allow Southwestern the prayed increase of $4,600,000, Southwestern complains, and argues its cross-appeal in this Court under the following points:

"Point I. The Commission Erred in Allowing a Return of Only 6% on a Net Investment Rate Base.

"Point II. The Commission Erred in Refusing to Recognize and Give Weight to the Present Value of the Company's Property.

"Point III. The Commission Erred in Computing the Amount of Rate Increase in such a Way that the Company Never Will Be Able to Earn as Much as the Commission Found It Is Entitled to Earn."

The record before us is voluminous: consisting of more than five thousand typewritten or mimeographed pages, and more than eight hundred pages of printed abstracts and briefs. Even to list the adjudicated cases and standard text books and commentaries cited would

consume several pages. We come now to the decision we have reached.

I. *Extent of Review.* At the outset and before discussing the specific issues, it is well that we again state the extent to which the Circuit Court in the first instance, and this Court on appeal, reviews the Commission's findings of fact in a case like this one. The applicable statute is Paragraph 73-233 (d) Ark. Stats.:

"The review shall not be extended further than to determine whether the Department (Commission) has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the complainant under the Constitution of the United States or of the State of Arkansas."

If the Department's order is supported by substantial evidence, free from fraud, and not arbitrary, it is the duty of the Courts to permit it to stand, even though the Courts might disagree with the wisdom of the order.

As regards the extent of the review sought by the Cities, we quote from *Department of Public Utilities* v. *Arkansas-Louisiana Gas Co.*, 200 Ark. 983, 142 S. W. 2d 213:

"It is contended, and we think correctly, that since there is no claim by appellee that the order of the Department complained of violated any of its constitutional rights, the review of such order 'shall not extend further than to determine whether the Department has regularly pursued its authority'. But this does not mean that the courts cannot inquire beyond mere formality. If the courts may be resorted to by any party before the Department 'for the purpose of having the lawfulness of any of its final decisions or orders inquired into and determined,' as provided in Sec. 2097 (a), then the phrase in Sec. 2097 (d), 'to determine whether the Department has regularly pursued its authority', must mean something more than an inquiry into the regularity of the proceedings before the Department. The proceedings before the Department might be regular in all respects, and still its order might be illegal and void as being

arbitrary, unreasonable, without any substantial evidence to support it, or in fraud or corruption. *Jernigan, Bank Com.* v. *Loid Rainwater Co.,* 196 Ark. 251, 117 S. W. 2d 18; *Lion Oil Refining Co.* v. *Bailey,* 200 Ark. 436, 139 S. W. 2d 683.''

As regards the review sought by Southwestern, we do examine, and have so examined, to see that the order of the Commission does not amount to a confiscation of the property of the Utility, and that no rights under the United States or State Constitutions have been invaded. See: *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, 64 L. Ed. 908, 40 S. Ct. 587; *Board of Public Utility Com'rs* v. *N. Y. Telephone Co.,* 271 U. S. 23, 70 L. Ed. 808, 46 S. Ct. 363; *Alabama Public Service Comm.* v. *Southern Bell Telephone Co.,* 253 Ala. 1, 42 So. 2d 655; *Dept. of Utilities* v. *New England T. & T. Co.,* 325 Mass. 281, 90 N. E. 2d 328; *New England T. & T. Co.* v. *Department of Public Utilities,* 327 Mass. 81, 97 N. E. 509.

II. *The Cities' First Contention.* As we have previously stated, the Commission found that Southwestern's intra-State "net plant, used and useful, on December 31, 1950" was $34,199,000. The Cities have not seen fit to urge before this Court any question as to the correctness of the *"rate base"* selected by the Commission; that is, the Cities do not question, in this case, the *"net cost, less depreciation",* as the method of fixing the rate base. Rather, the Cities, in their present contention, merely claim that the Commission selected an arbitrary date for the evaluation of the property of Southwestern. We agree with the Cities in this contention.

The hearings began before the Commission on September 5, 1950; and Southwestern then offered figures of its plant extent and valuation as of May 31, 1950—four months prior to the hearings. As the hearings progressed, evidence was shown as to valuations, expenses, and earnings of Southwestern, as of September 30, 1950. All of the evidence was completed, and the hearings adjourned, on November 28, 1950. So it is obvious that there is no testimony in the record as to *what actually was* the plant extent and valuation as of

December 31, 1950—a date more than thirty days after the closing of the testimony. Figures as to the December 31st valuations were mere guesses or approximations, with no record evidence to show that proposed installations were ever in fact consummated. After the testimony closed, the Commission could not delay its opinion in order to see what equipment might be installed. The testimony must be *in the record,* in order that there may be a review.

One of the Commissioners dissented from his associates on the point under discussion, and used this language in his dissenting opinion:

"I do not agree with the other Commissioners that the estimated values of the company's property *as of December 31, 1950,* should be used in determining its rate base. The December 31 figures are based on estimates which I am unwilling to accept. At the beginning of the present hearing, the Company asked that its rates be based on May 31, 1950, values, expenses and earnings. During the hearing figures were shown for September 30, 1950, and in October estimated figures were shown for December 31, 1950. September 30 is the latest date upon which there is documentary evidence in the record of the company's actual rate base, and that is the closest date to that on which the increased rates were applied (September 21), and there is sufficient evidence in the record of the actual revenues and operating expenses in relation to September 30 to substantiate a finding by the Commission based on September 30 figures.

"I believe that the rates based on September 30 figures would be reasonable and just for the present and for a reasonable time in the future and would be in line with requirements prescribed by the courts.

"Using the September figures, the company would be entitled to a rate increase of $3,177,000 per year instead of $4,600,000, which it is hoping to receive and instead of $3,605,591 allowed under the December 31 figures . . . But I am unwilling to apply the 6% rate

of return to the estimated values, income and operating expenses of December 31, 1950.''

In support of the December 31, 1950, figures, Southwestern insists that it is proper to add something for future net capital additions, and that the Commission had a right to take the testimony of Southwestern's witnesses as to what would be the condition of the plant on December 31, 1950. To buttress its contention, Southwestern quotes from two cases of the Supreme Court of the U. S. The first is *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400, 71 L. Ed. 316, 47 S. Ct. 144:

''In every confiscation case, the future as well as the present must be regarded. It must be determined whether the rates complained of are yielding *and will yield,* over and above the amounts required to pay taxes and proper operating charges, a sum sufficient to constitute just compensation for the use of the property employed to furnish the service; that is, a reasonable rate of return on the value of the property at the time of the investigation *and for a reasonable time in the immediate future.''*

The second case urged by Southwestern is *Federal Power Com.* v. *Hope Nat. Gas Co.,* decided in 1944, 320 U. S. 591, 88 L. Ed. 333, 64 S. Ct. 281, in which the Supreme Court of the U. S. said, in reference to the Federal Power Commission:

'' '. . . *And it* (the Commission) *added $1,392,021 for future net capital additions,* $566,105 for useful unoperative acreage, and $2,125,000 for working capital. It used 1940 as a test year to *estimate future revenues and expenses.* It allowed over $16,000,000 as annual operating expenses—about $1,300,000 for taxes, $1,460,-000 for depletion and depreciation, $600,000 for exploration and development costs, $8,500,000 for gas purchased. *The Commission allowed a net increase of $421,160 over the 1940 operating expenses, which amount was to take care of future increase in wages, in West Virginia property taxes, and in exploration and development costs. . . .' ''*

We recognize that a utility rate must be reasonable and just as to the present, and also for a reasonable time in the future, and that the Commission may—in order to forestall subsequent applications for rate increase—allow a reasonable figure for anticipated extensions to be made in the future. But to anticipate reasonable future extensions is one thing, and quite another thing to select a future date after the closing of the evidence on which to base a factual finding as to value of property. We adhere to the view that in order to determine the actual plant, used and useful, on a certain date, there must be *proof,* as distinguished from mere *promises or predictions*: so we hold that the Commission, should have used the figures of September 30, 1950, rather than those that it did use, supposed to be December 31, 1950. The correction of this error by the Commission, means the adoption by us of the figures stated in the opinion of the dissenting Commissioner, as heretofore quoted.

III. *The Cities' Second Contention.* This relates to the service rates charged for only one month. Southwestern charges its telephone customers one month in advance. That is, the bills rendered the customers on September 21st and afterwards, showed the increased rate, which went into effect on September 21, 1950, as heretofore stated. The Cities contend, that since the order allowing the increase did not go into effect until September 21st, the bills should have shown no increased rate for one month thereafter. We see no merit to the Cities' contention on this point.

On August 21, 1950, Southwestern filed a petition for increased rates, and gave notice that such rates would become effective on September 21, 1950. The Commission suspended the proposed rates, and a bond was then filed. Under the Statute (§ 73-217 Ark. Stats.), the bonded rates became effective on September 21, 1950, and after that date, the bonded rates were the only lawful rates that the Company could charge.

The Statute previously referred to (§ 73-217 Ark. Stats.) says:

". . . that notwithstanding any such order of suspension, the public utility may put such suspended rate or rates into effect on the date when it, or they, would have become effective if not so suspended, by filing with the Department (Commission) a bond . . . to insure prompt payment of . . . refunds."

Furthermore, the same section, in discussing the powers of the Commission, says:

"The Department (Commission) for good cause shown, may allow changes in rates without requiring the thirty (30) day notice, under such conditions as it may prescribe. All such allowed changes shall be immediately indicated upon its schedules by such public utility."

This section is ample authority to support the conclusion of the Commission as to the effective date of the rates: so we find no merit to the Cities' second contention.

IV. *The Cities' Third Contention.* The Commission, in determining the rate base, allowed Southwestern working capital in the sum of $410,000, in addition to the value of its properties. The Cities contend that no such sum should have been allowed for working capital, because (a) Southwestern Collects in advance from its customers; and (b) because the Commission allowed Southwestern the sum of $445,000 for materials and supplies. The Cities argue that with $445,000 worth of materials and supplies, and with collections in advance for its services, the result is that Southwestern has ample operating capital, without an additional $410,000. To review all the cases cited by the Cities in support of their contention, and those cited by Southwestern in opposition to such contention, would be unduly prolonging this opinion. While we think the figure of $410,000 is high, nevertheless, for us to substitute another figure, would be to substitute our judgment for that of the Commission, and to become a trier of the facts. This would be beyond the extent of review, as heretofore discussed. Therefore, we uphold the Commission against the Cities' third contention.

V. *The Cities' Fourth Contention.* After determining the rate base, the Commission allowed South-

western a rate of return of 6%. The Cities claim that this 6% is grossly excessive, and that the rate of return should be 5%. This question blends into the second point of Southwestern's cross-appeal; and we will discuss it when we consider that phase of the case.

VI. *The First Point of Southwestern's Cross-Appeal.* Southwestern's cross-appeal presents three questions, as heretofore copied; and each is a challenge to the findings and order of the Commission. Briefly, these points relate to (a) the rate base; (b) the rate of return; and (c) computations. Considering these in the order mentioned, we first discuss the rate base.

Southwestern insists that the Commission should have determined the *real value* of Southwestern's properties in Arkansas, rather than to have used the "cost less depreciation" basis. The argument of Southwestern is, that it is entitled to earn a fair return on property at its present day value. We revert to a statement in an earlier portion of this opinion—*i. e.*: "A most important factor if not the prime one, is the so-called 'proper rate base', which means the method used to determine the proper value of the property of the utility dedicated to and actually employed in the public use."

In Pond on Public Utilities, 4th Ed. § 590 *et seq.*, there is a discussion of various methods to determine the rate base. Among those mentioned are (a) original cost, (b) the cost of reproduction, (c) outstanding capitalization, (d) present value, (e) prudent investment, and (f) net earnings. In the American Bar Association Journal for December, 1948, at page 1096, *et seq.*, there is an article entitled: "Public Utility Property: Views of Commission Counsel as to Valuation". This article is by Everett C. McKeage, Chief Counsel of the California Public Utility Commission, and contains an excellent statement of the historical developments of the various tests and rules used in this matter of the rate base. It is pointed out that in "hard times" utilities want the original cost as the basis of calculation, whereas in times of inflation, the utilities want the reproduction value as the basis of calculation. A careful study of the said

article from the *American Bar Association Journal* has been helpful to this Court. From all of the cases and authorities which we have studied, we reach the conclusion that no public utility has a *vested right* to any particular method of valuation. The aim of a regulatory body is to determine a fair valuation; and the method of calculation may vary as between the type of the utility involved and the economic conditions existing.

In the case at bar, the Arkansas Public Service Commission used the "cost less depreciation" method; but even with that system, we point out that the Commission failed to go to the real beginning of Southwestern's system in Arkansas, and failed to see whether Southwestern had built its plant during a period of excessive rates. In short, the Commission through necessity (being understaffed for the class of investigation thrust upon it in a state-wide transaction involving thousands of miles of lines and the equipment and other properties peculiar to the business) accepted Southwestern's figures in many instances; but unquestionably the Commission was not satisfied that it had plumbed the full depth of the problem. Until Southwestern either has a separate corporation for each State it serves, or until the various States served by Southwestern pool their regulatory staffs for a system wide investigation, there will always be a thought that the other States are played against the one immediately concerned. From what we have said, it is clear that Southwestern has not made a case on its first point. And in this connection we point out that the record here reflects that Southwestern obtained a rate increase of approximately 1½ million dollars in Arkansas in September, 1948; and then filed in May, 1949, an application for a further rate increase of 2½ million dollars. This May, 1949, application was substituted in August, 1950, for the present application of $4,600,000. So it is evident that applications for rate increase by this utility have been persistently pursued. Should Southwestern prosecute an application for a further rate increase, then the words of this paragraph will have especial pertinency. Then, undoubtedly the entire rate structure would be re-

examined by the Commission; and, of course, the doctrine of *res judicata* would not apply.

The Commission took occasion to point out that Southwestern was using a portion of its receipts in a newspaper and radio campaign designed to win the public to the idea of a rate increase. The Commission had this to say about the matter:

"However, the record does disclose some unusual and excessive expenditures charged to the advertising account, and admittedly some of the advertising expense was incurred in connection with the application for a proposed rate increase. The Commission condemns the practice of the Company in using the ratepayers' money to conduct an advertising campaign to increase the rates proposed to be charged the ratepayer by the Company."

The Commission's criticism of the Company's action in using net earnings as a means of influencing rate increases is no doubt directed to the proposition that a *quasi*-judicial board has been created by the State to act for the public and for the utilities; and its determinations are not to be influenced by appeals directed to other sources. We put the stamp of approval on the Commission's quoted language, which indicates that in hearings for rate increases by any utility, the Commission will carefully examine to see how much is being paid for overhead and staff work, whose duty in whole or in part is to try to get rate increases from the public. The utility must use all its receipts as though they were a public trust. Receipts must not be dissipated in an effort to get futher increases from the public. We are far from satisfied by the present record that Southwestern's rate base was thoroughly disclosed and explored. But on the record before us, we are convinced that Southwestern is not entitled to complain on the rate base.

VII. *The Second Point of Southwestern's Cross-Appeal.* This relates to rate of return. We have already shown that the Commission fixed 6% as the rate. The Cities claim this is too high; and Southwestern now insists that the Commission erred in allowing only 6%. Here is a portion of Southwestern's argument:

"First, we will discuss the Commission's failure to give weight to the principle that the Company is entitled to a return which is commensurate with returns on investments in enterprises having corresponding risks. Second, we will turn to the other respects in which the Commission has failed to permit the Company to protect its financial integrity so that it may maintain its credit and attract capital."

In an effort to show that it was entitled to a greater return than 6%, Southwestern called a prominent Arkansas banker, the abstract of whose testimony is as follows:

"Is testifying as to opinion of earnings currently required by telephone business in Arkansas to maintain credit with present investors. Based determination upon general knowledge of business condition of enterprises throughout Arkansas. For the purpose of securing funds for manufacturing industry you must show you can earn 15 to 25% on funds. Earnings of banks in Arkansas are a matter of record. Net returns of earnings of total invested capital in banks in Arkansas last year was 12%. This has been rate of earnings for the last four to six years. Must show earnings of 15% before you can attract funds to start state or national bank. Has no specialized knowledge of telephone or utility financing. Can tell you nothing as to securities of Southwestern Bell. Frequently invests in stock of A. T. & T. It is witness' opinion that Southwestern Bell will have to show investor at least 8% earned on money."

The witness quite candidly stated that he was not familiar with the fixing of rates to be charged by public utilities. As opposed to the views of the witness, we quote from Page 1099 of the December, 1948, issue of the American Bar Association Journal, being a portion of the article by Mr. McKeage, heretofore mentioned:

"The status of the privileged and sheltered position of a public utility, under regulation, carries with it corresponding obligations to the public. It must follow that a public utility may not lawfully demand the application

of the same rules to its operations that are applicable to an unregulated business. Having undertaken to serve the public and having acquired the status that entitles it to claim the enjoyment of the extraordinary privileges available to it, a public utility may not also claim that it is entitled to the speculative profits to which the un-regulated business is entitled. It must be remembered that a public utility is guaranteed against many of the hazards to which the unregulated business is subject.''

Without prolonging the discussion of this point, we reach the conclusion that the 6% rate of return is fair, but at all events, Southwestern has no just cause for complaint on the rate of return fixed by the Commission until Southwestern makes full and complete disclosure of all matters affecting its operations. We accept the Commission's figure of 6% in this case, and thus refuse Southwestern's second point and the Cities' fourth point.

But it must not be deduced that in approving the 6% rate of return in this case, we are putting the stamp of approval on that rate of return in future cases regarding this or any other utility. As a matter of fact, a lower rate of return has been found to be fair for utilities in other cases. Furthermore, in considering any rate of return as regards Southwestern, the Commission should take into consideration the peculiar position that Southwestern occupies to its parent company, American Telephone & Telegraph Company, and to the number of States served. For instance, we mention only a few such factors:

(a) American is now receiving from Southwestern 1% of the gross income of Southwestern for ''super-vision'';

(b) American borrows money at 3% or less, and has been charging Southwestern 4.75% for money loaned it;

(c) Southwestern purchases its equipment from Western (owned or controlled by American) at prices that are not shown to be competitive, and dividends to

American from Western have exceeded 12% in a single year;

(d) the apportionment of expense and income to Southwestern from inter-state and intra-state business is not clearly shown;

(e) the idea of Southwestern expecting a 6% return from one State that it serves, rather than from the entire system, is just as illogical as applying the 6% rate of return to one community; and Southwestern's own suggested rates negative such idea.

In short, American, as the owner of Southwestern, receives profits and returns from Southwestern in a number of ways, and all of these should be taken into consideration in considering the rate of return that the owner of Southwestern should receive.

VIII. *The Third Point of Southwestern's Cross-Appeal.* In this point, Southwestern claims that the Commission has failed to allow Southwestern enough revenue to take care of investment costs that "will mount in future years." Southwestern uses these figures, which it claims show what will happen to the Company's rate of return:

"In 1946 (Investment Per Telephone
    of $198.66) .................................................................... 6.05%
In 1950 (Investment Per Telephone
    of $263.46) .................................................................... 4.55%
In 1953 (Investment Per Telephone
    of $329.99) .................................................................... 3.64%"

Of course, whether costs "will mount" depends on a number of factors, many of which are in control of Southwestern—some such being excessive overhead, advertising for rate increases, payments to Western Electric for equipment, etc. And, in regard to what Southwestern has paid Western Electric for equipment, the following excerpt from the Commission's opinion is pertinent and unanswered.

"The record does not show the profits on Western's business with the Company on its Arkansas operations.

We should have these figures to determine whether any amount should be deducted from the rate base by reason of excessive prices paid to Western in 1948, 1949, and 1950, as was done in California, Missouri, and West Virginia. We ask that full information be given us on this question."

Until Southwestern furnishes the information above requested, it can hardly say, with hope of success, that "the Commission erred in computing the amount of rate increase."

When a utility seeks an increase of existing rates, the burden is, of course, on the utility not only to offer all evidence to justify such increase, but also to comply with all reasonable requests of the Commission for full disclosures. The Commission, in such instances, has not only the prerogative but also the duty to make requirements for full disclosure, since the Commission acts under valid Legislative authority to see that the interests of the public are fully protected.

One phase of Southwestern's argument seems to be that the more telephones in a city, the greater is the cost to operate the individual phone. This is contrary to the accepted theory of mass production. It is a matter of common knowledge that our national manufacturing supremacy has come about through unification of operations, reductions in overhead costs, financial ability to produce when markets are slack as well as during periods of high demand. Nothing in the testimony other than subscriber access to greater connections, distinguishes the nature of Southwestern's business to such an extent that the Commission would have been justified in finding that multiplied business in a city or town imposes the peculiar burden spoken of—that is, a higher cost per telephone. If this argument should be followed to a logical conclusion, then distinct operating units would be preferable to unity of assets, equipment, and personnel. Certainly the Commission would be justified in asking for more detailed information before placing its approval upon an accounting argument so completely out of harmony with general business experience.

IX. *The Little Rock And Fort Smith Rates.* Distinct from all other questions are the issues raised by the Cities of Little Rock and Fort Smith as to the rates to be charged in those cities under the increase allowed in the case at bar. After the Commission allowed the said increase, Southwestern brought in a rate schedule which classified the Arkansas cities it serves into eight groups, based on the type and number of phones in each such city; and the larger the city, the greater was the rate charged for the individual phone. For example, in Portland, Arkansas, with not more than 299 dial phones, the rate for a one party residence phone was $3.75 per month; whereas in Fort Smith (with an excess of 17,000 dial phones), the rate for a one party residence phone was $5.50 per month, and in Little Rock (with an excess of 30,000 phones), the rate was $6.00 per month. Southwestern sought to justify the greater charge in Little Rock and Fort Smith by the statement that the more phones in a city, the greater cost per phone. But against this contention, Little Rock and Fort Smith offered figures from some other cities served by Southwestern. For instance, Little Rock has 57,670 phones and Southwestern is seeking to charge $6.00 per month for a one party residence phone, whereas:

(a) Oklahoma City, Oklahoma, has 123,083 phones, and the rate for a one party residence phone is $3.75 per month;

(b) Houston, Texas, has 272,291 phones, and the rate for a one party residence phone is $4.75 per month; and

(c) Dallas, Texas, has 227,118 phones, and the rate for a one party residence phone is $4.65 per month.

Faced with these facts, Southwestern said that it had to charge higher rates in Little Rock and Fort Smith to make up its losses in the smaller exchanges in Arkansas. Thus, it seems that Southwestern meets itself in a circular argument. First it says ''The more phones the more costs,'' and then says ''the larger places must pay for the smaller places.'' This phase of the case supports

our observation heretofore made that either Southwestern should set up its books on a state level, or the regulatory bodies of all the States served by Southwestern should pool their staffs to make a system wide examination. But the questions presented by Little Rock and Fort Smith are matters that are not final and can be developed further in the situation brought about by the remand of this case.

We are remanding this case to the Pulaski Circuit Court, to be remanded to the Arkansas Public Service Commission, with directions to allow Southwestern an increase of $3,177,000 per year, instead of the $3,605,591 allowed by the Commission; and the Commission will order refunds to be made by Southwestern in the amount the bonded rates exceed the determined rates. Southwestern will necessarily present to the Commission a revised classification of cities and rate scales; and Little Rock and Fort Smith will then be given an opportunity to present their present contention to the Commission. The order of the Circuit Court affirming the order of the Public Service Commission, is affirmed in all respects, except as to the matters mentioned in this paragraph. Costs of appeal are assessed against Southwestern, since the Cities have obtained reversal in a case appealed from a Law Court.

Mr. Justice MILLWEE and Mr. Justice GEORGE ROSE SMITH would sustain the Cities' third contention, and disallow Southwestern a working capital of $410,000. To such extent only, they dissent from the opinion.

## ON REHEARING.

ED. F. McFADDIN, Justice, on Rehearing. The Cities have filed a petition requesting us to include additional directions in our judgment; and Southwestern has filed a petition for rehearing, claiming several errors in our opinion. We consider these petitions in the order named.

I. *The Cities' Petition for Additional Directions.* The Cities ask that we definitely state that Southwestern shall pay 6% interest on the refunds—said interest being

payable because Southwestern, under its bond, has collected a greater amount from the subscribers than we determined that Southwestern should have collected. We hold that the Cities are correct in this request. Interest is ordinarily allowed as damages for the wrongful detention of money. 47 C. J. S. 13. The Statute which requires a utility to post a bond as a condition to putting a rate increase into immediate effect, provides that the bond is to secure the prompt payment "of any damages or refunds to the persons entitled thereto." Ark. Stats. § 73-217(b). We hold that the interest is fully covered by the word "damages" in the statute.

Ark. Stats. § 73-217(d) is relied on by Southwestern, in its claim that interest is to run only from the date of judgment. That section provides that if the utility fails to make refund within thirty days, the attorney member of the Commission shall bring suit and recover "the amount of all refunds due, together with interest thereon at the rate of 6% per annum, and all court costs." The Statute does not say from what date the interest is to run; and it is certainly logical that the utility should not have the benefit of the free use of the subscribers' money, when such use came about through the utility's own effort. So we amend our judgment to provide that the Public Service Commission shall allow the subscribers 6% interest on the refunds, with the interest to run from the date of the excess payments to the date of repayment.

The second point presented by the Cities is whether an attorneys' fee may be paid, to the attorneys for the Cities, out of the amount to be refunded to the subscribers. We hold that such attorneys' fee cannot be so paid. The refunds belong to the subscribers, and not to the Cities; and there is nothing in this record to show that the subscribers have agreed for a fee to be paid the attorneys for the Cities. We find no statutory authority for this request by the Cities. In *Miller* v. *Ft. Smith*, case (*Peavy* v. *Pulaski County*, 103 Ark. 601, 148 S. W. 491):

"Statutes regulating costs in litigation and fees of officers are to be strictly construed, 'and no officer is

entitled to fees, taxed as costs in cases unless there is a statute authorizing it.' ''

Even though the attorneys for the Cities have rendered valuable services, we cannot order them to be paid out of the money due the subscribers. We must presume that if the attorneys are special counsel, they have contracts for their fees; or if they are elected city attorneys, that they are cognizant of the provisions of § 19-912, § 19-1015 and § 19-1025 Ark. Stats. Therefore, we deny the second portion of the Cities' request.

II. *Southwestern's Petition for Rehearing.* Southwestern lists seven alleged errors in our original opinion. Six of these are of slight importance, and relate principally to verbiage. Illustrative of the entire six, we list and discuss these two:

(a) In Topic VII, in discussing "The Second Point of Southwestern's Cross-Appeal," we used this sentence: "(a) American is now receiving from Southwestern 1% of the gross income of Southwestern for 'supervision' ''. In the petition for rehearing, Southwestern says this 1% is not only for supervision, but also for "a great variety of valuable services rendered by the parent company". The record does show that other services were rendered by American to Southwestern; so we add the words "and other services", immediately after the word "supervision".

(b) In the same Topic of our original opinion, we used this sentence: "(b) American borrows money at 3% or less, and has been charging Southwestern 4.75% for money loaned it." In challenging the correctness of the figure of 4.75%, Southwestern asks us to go back to the transcript, but with becoming candor, Southwestern admits that in the printed abstract filed in this Court, the following appeared as unchallenged:

"A. T. & T. Advanced Southwestern Bell $406,800,-000 during the 4½ year period from 1946 to 1950. Interest begins from time the advance is made. Rate is 4.75%."

94

When Southwestern did not challenge the printed abstract, we presumed it to be correct, but now on rehearing, Southwestern insists that we should go back to the transcript to see that the figure is not 4.75%. In all fairness, we have done this, and find that the testimony shows that Southwestern was charged interest at 2.75% by American. Likewise in all fairness, the record shows that American borrowed money at less than 2.75%, so the net result is that American was making a profit as between borrowed money and money loaned to Southwestern.

So much for the six minor points urged by Southwestern. The main point which Southwestern urges on rehearing, relates to that portion of our opinion in which we adopted the opinion of the dissenting Commissioner, and fixed $3,177,000 per year as the rate of increase to which Southwestern was entitled. In our opinion, we quoted and adopted this language from the opinion of the dissenting Commissioner:

"Using the September figures, the company would be entitled to a rate increase of $3,177,000 per year instead of $4,600,000, which it is hoping to receive and instead of $3,605,591 allowed under the December 31 figures."

Southwestern now claims that this figure of $3,177,-000 is erroneous, and says that the dissenting Commissioner reached the figure on erroneous conclusions drawn from exhibits and evidence; and Southwestern now urges:

"Wherefore, Southwestern respectfully requests that the Court remand this cause to the Pulaski Circuit Court to be remanded to the Arkansas Public Service Commission with directions that the Commission (1) recompute the amount of the rate increase of $3,177,000 on the basis of factors properly applicable thereto, and (2) examine Southwestern's actual operating results since September, 1950, and fix rates, in the light of such experience, which are just and reasonable."

We have given most careful consideration to Southwestern's argument on this point, and have gone back to

the calculations and exhibits, and from all this, we reject Southwestern's contention for either of two reasons:

(a) The present insistence of Southwestern—claiming error in the basic figures on which the result of $3,177,000 was reached—was not made in Southwestern's original brief or argument. Rather, Southwestern insisted on a figure of $4,600,000, or at least the $3,605,591 allowed by the Commission. If there were basic errors which resulted in the figure of $3,177,000, we think Southwestern should have called attention to these in its original case, rather than to have chanced the result on the other figures.

(b) A second reason for rejecting Southwestern's present insistence regarding the $3,177,000 figure, is the fact that there is evidence in the record to support a lower figure than $3,177,000, and we think that figure used by the dissenting Commissioner is fair and reasonable under all the facts and circumstances in this case.

Therefore, we deny Southwestern's petition for rehearing.

GRIFFIN SMITH, Chief Justice (concurring in part and dissenting in part respecting the opinion on rehearing).

It seems to me that the first question resolved is wholly legislative and that the court's majority has read into the statute a condition the lawmakers left out. That part of the opinion dealing with interest rests upon the word "damages" found in the sentence relating to refunds. Justification for construction of *damages* is implied from the context of subdivision (b), § 18, Act 324 of 1935, Ark. Stats., § 73-217, reinforced by the views entertained by editors of Corpus Juris Secundum, v. 47, p. 13. But the Corpus Juris summation is that "Interest, being a creature of statute, the law allows it only on the ground of a contract for its payment, or as damages for the detention of money, or for the breach of some contract, or the violation of some duty, or where it is provided for by statute; but in courts of equity interest is

allowed or disallowed in the exercise of a sound discretion.''

Subsection (d) requires the Public Service Commission to bring suit against any utility that fails to make restitution within 30 days from the effective date of any order reducing increases that had been collected under authority of the bond, and in this order the Commission fixes the amount or amounts returnable to the customer. The suit is to be prosecuted in the name of the State by the attorney member of the Commission.

Interest is first mentioned in subsection (d), and by express language the demand shall be ''for the amount of all refunds due, together with interest at the rate of 6% per annum, and all court costs.''

This mandate must be read in the light of pertinent matter preceding it—particularly the expressions disclosing a legislative design to have the Commission determine the amount to be refunded. It is noteworthy that subsection (c) does not confer upon the Commission the right to include interest on refunds. Unless by implication there is interpolated into the Act something the general assembly left out of it, the only condition under which interest is chargeable is when suit becomes necessary. Such a suite would be predicated upon violation of the Commission's order, and the ''effective date of such order'' is the decisive factor. It is noteworthy that the subsection prohibits the maintenance of such suit unless instituted within two years *''after such final determination.''* Here, again, the Commission's order is made the date from which violation begins.

If it should be argued that interest automatically attaches when money is withheld, the answer is that the legislature saw fit to apply its own treatment, rendering common law remedies inapplicable. The general rule is that interest accrues only where there is a liquidated demand. In the utility field the right to increased rates is ordinarily debatable and it is subject to investigation by machinery the state has established for that purpose, hence it cannot be said that the legislative scheme visual-

ized a purpose to penalize the utility it compelled to proceed by a particular method, but allowed it on condition that bond be given to put the proposed rate into effect at once.

A practical thought that might with good reason be assigned for the legislative failure to give specific directions is this: The amount returnable to each affected patron as interest will necessarily be small. It must be computed on a month-to-month basis, entailing a tremendous clerical outlay. For example, if A paid a service charge of $11.93 for the first month collections were made following inauguration of the rates covered by the bond, the difference between what was actually paid and the amount this court has authorized for certification by the Commission would be refunded, with interest at 6% for the period the over-payment was in Southwestern's possession. The time element for the second month, and the third, and all succeeding months, would be progressively less. This is true because interest would be payable under the majority opinion only for the actual time the customer had been deprived of the excess payment.

But this is not all. The schedule Southwestern filed with the Commission applied to intrastate long distance calls. Thus, refunds must be made for that proportion held to be excessive, and each customer's bill must be examined to ascertain what the refundable difference is. On this excess amount so collected Southwestern paid the Arkansas 2% sales tax, and on all calls where the charge was 25 cents or more it paid a federal tax of 25%. Unless these differentials are to be regarded as *de minimis* (a determination Southwestern cannot arbitrarily make, and an authority we do not assume the individual subscriber will voluntarily confer), interest must be computed with these factors in view, and each over-payment must yield a 6% return for the number of months involved. Certainly the Federal government will not pay interest on these over-charges, so the utility sustains what at first glance appears to be a net loss. But *is* it?

The bookkeeping and clerical effort involved in these comparatively trivial transactions will very probably cost more than the aggregate of all the interest found to be due. It becomes a part of the cost of administration and is an allowable item in fixing rates. We know that Southwestern has indicated a purpose to apply for further increases based upon operational costs now greater than they were when the case before us was decided. Therefore the Commission, under fair inferences flowing from this court's opinion on rehearing, would allow the clerical and other administrative costs incidental to the tedious task of computing interest on the basis of diminishing time factors; and, furthermore, this means that the subscriber who did not patronize the intrastate long distance service will be penalized for the benefit of the one who did.

Perhaps in failing to provide for the payment of interest the legislature took these matters into consideration.

I agree with that part of the opinion which refuses to authorize the payment of attorney fees.

Southwestern contends that mathematical errors easily demonstrable were made by Commissioner Wood who wrote a dissenting opinion. Essential findings by Judge Wood were incorporated in this court's opinion and were the bases for our decision. It is now insisted that Commissioner Wood, if permitted to do so, would recognize these errors and no doubt would modify to some extent the conclusions arrived at. The opinion on rehearing disposes of the suggestion that Judge Wood be permitted to say whether the mistakes alleged activated his dissent and justified the result he reached. This disposal is achieved by calling attention to Southwestern's failure to raise the question in the appeal. A statement in the opinion is that "A second reason for rejecting Southwestern's present insistence regarding the $3,177,000 figure is the fact that there is evidence in the record to support a lower figure than $3,177,000."

Would it not be a better rule (in circumstances where the Commission's majority made one determination and the third Commissioner reached a different conclusion) to remand the cause to circuit court with directions to immediately send it to the Commission for a determination of findings that came to us from divided authority? This would in no way impair our acquiescence in the minority view, but it would permit the Commissioner whose findings we followed to say whether he erroneously omitted certain essentials or mistakenly included others. The entire proceeding could and should by our order be terminated within less than thirty days.

There is one other matter it is appropriate to call attention to. From my own point of view there was nothing in the original opinion to which attorneys for Southwestern could from an impartial standpoint believe to be a criticism of their trial tactics, involving omission or commission; but their briefs on rehearing indicate a feeling that the court impliedly disapproved of the zeal they displayed in an obviously sincere purpose to represent their client to the full extent of the very great ability and meticulously correct ethical conduct they have always shown in advocacy before this court.

We all know that a corporation such as Southwestern, with far-flung interests and millions of dollars available and at stake, selects the ablest of counsel and then provides these representatives with technical, scientific, and run-of-the-day information that is seldom available to small public groups concerned with problems common to the average citizen. The very able group of counsel arrayed against specialists for the telephone company was necessarily at an initial disadvantage in procuring information and in presenting it to the Commission. But the Commission is the impartial arbiter for the utilities and for the public, and appellate courts must rely largely upon what the Commission's findings are after it has had the benefit of professional aid given by lawyers such as those who served the disputants. It was not the court's intent to detract from the high standing of any of these attorneys, or the Commissioners, by any word, or by

sentence from which such an inference could be drawn; nor was there an unexpressed thought in this respect.