STATE OF MONTANA, ex rel. ARNOLD H. OLSEN, PLAIN-
TIFF AND APPELLANT, v. PUBLIC SERVICE COMMIS-
SION OF THE STATE OF MONTANA, ET AL., AND THE
MONTANA POWER COMPANY, DEFENDANTS AND RE-
SPONDENTS.

No. 9676.
Submitted January 22, 1957.   Decided March 19, 1957.
308 Pac. (2d) 633.

Mr. Arnold H. Olsen, former Atty. Gen., amicus curiae.

Mr. Forrest H. Anderson, Atty. Gen., Mr. William F. Crowley, Asst. Atty. Gen., and Mr. Charles W. Leaphart, Jr., former Asst. Atty. Gen., for appellant.

Mr. T. B. Weir, Helena, Mr. Robert D. Corette, Mr. William H. Coldiron, Mr. J. T. Finlen, Mr. Samuel B. Chase, Jr., Mr. John C. Hauck, Butte, Mr. James B. Patten, former Secretary-Counsel Board of Railroad Commissioners, and Mr. John V. Potter, Secretary-Counsel, Board of Railroad Commissioners, for respondents.

Mr. Olsen, Mr. Leaphart, Mr. Corette and Mr. Coldiron argued orally.

PER CURIAM.

This action was brought by plaintiff under R.C.M. 1947, section 70-128, to challenge the validity of an order made by

defendant Board of Railroad Commissioners allowing an increase in gas rates to be charged by the defendant, the Montana Power Company.

The district court sustained the order of the Board and this appeal followed.

The Montana Power Company, on May 5, 1953, made application before the Public Service Commission to increase its rates and charges. A public hearing was held and a number of corporations, associations, individuals and labor organizations appeared as protestants. Very little evidence was offered by protestants except to show generally that they were antagonistic to any increase in the rates and charges and in some instances that the particular protestant was not in a position financially to absorb any increased rate and that any increase in the rate would be detrimental to those who would be obliged to pay it. The Commission granted the increase sought.

A motion for reconsideration of the question was made and denied.

This action was then instituted by plaintiff but none of the other protestants took any further action.

At the hearing in the court below additional evidence was introduced.

Consistent with R.C.M. 1947, section 70-128, the court transmitted a copy of the evidence to the Commission for consideration. The Commission made a supplemental order on August 2, 1955, adhering to its former ruling.

The court thereupon entered judgment upholding the action of the Board.

At the outset, we point out that in determining the questions before the court neither the trial judge nor the members of this court can discharge their duty by merely voting on whether they as individuals prefer the old or the new rate. They do not make a choice to either stand with the people or with the power company.

The action of the courts must be governed by recognized principles of law as applied to the facts, and this court must

render its decision in writing stating the grounds of the decision. R.C.M. 1947, section 93-212.

We mention these matters simply to indicate that we agree with the Board when it said, "a popular decision would be to deny any increase, but popular political decisions cannot be considered."

Plaintiff makes several assignments of error. The first one ██ urged is that it was error on the part of the court to affirm the order of the Board, because he asserts it was not supported by sufficient evidence.

Plaintiff contends that too much reliance was placed by the Board upon evidence offered by the Company, showing the reproduction cost new less depreciation, in arriving at the value of the Company's plant dedicated to the service of its customers, on which it is entitled to a reasonable rate of return.

The evidence shows that the Montana Power Company commenced distributing natural gas in 1931. In 1933 and again in 1935 it took a voluntary reduction in rates and has never sought or obtained any increase until this proceeding was commenced. Since the Company commenced distributing gas, its labor costs have increased 132 per cent; the cost of gas pipes has increased 100 per cent; the cost of automobile equipment 169 per cent; gas meters 131 per cent; gas valves 151 per cent and taxes 211 per cent. As to valuation of the Company's plant used to serve its general customers, as distinguished from service to the Anaconda Company, three different sets of figures were submitted. It was shown that the reproduction cost new less depreciation amounted to $39,179,067 as of 1952.

The value figures as of 1952 were computed from indices contained in the Handy Whitman Index of Public Utility Construction Costs, which the evidence shows is a compilation in general use in the United States.

This method of computation is calculated to reflect the cost of reproducing the plant under inflationary prices existing in 1952.

Other evidence of value of the plant used for serving the

general customers shows that the original cost of the plant was $23,022,028, and that the original cost less depreciation as of 1952 was $17,102,260. The estimated assessed value of its property, subject to ad valorem tax, was about $10,000,000.

At this point it should be noted that the assessed value of its taxable property does not and cannot include all the property because the gas reserves, under our Constitution, art. XII, section 3, cannot be taxed on an ad valorem basis, but must be taxed on the annual net proceeds.

The Commission, in its first order, fixed the period from July 1, 1953, to July 1, 1954, as the testing period for testing the reasonableness of the new rates. For this test period the Company estimated expenditures of $2,500,000 for additions to its property serving the general customers.

Likewise, it added $3,660,000 to the reproduction cost new which gives effect to the contemplated additions plus an allowance for estimated increased value due to anticipated price changes.

The gross revenue from the sale of gas to the general customers, excluding sales to the Anaconda Copper Company in 1952, was shown to be the sum of $4,780,346. The gross expenses were shown to be $4,114,112 for the same year, leaving a balance of $666,234.

Mathematical calculation shows that the net income of $666,234 represented a return of 1.70 per cent on $39,179,067, the claimed reproduction cost new in 1952 less depreciation; 4.56 per cent on $23,022,028, the original cost, and 6.13 per cent on $17,102,260, the original cost less depreciation to 1952. Before the district court, figures were submitted for the test period showing a return of 2.76 per cent on the actual net income of $1,137,425 under the new rate on the reproduction cost new less depreciation as of July 1, 1954, of $41,156,882, and a return of 9.16 on the original cost less depreciation of $17,543,346.

The Commission found that the fair value of the Company's

property used in selling gas to the general customers, as of December 1, 1952, was $30,000,000.

On this valuation, to which was added the sum of $1,410,060 for additions made during the test period, the rate of return would be 5.12 per cent for the year ending June 30, 1954.

As to the Anaconda Company, the Commission found that it was the exclusive user of gas imported from Canada; that the Federal Power Commission had ordered the Anaconda Company to pay all the costs thereof and for the facilities used for serving it to the Anaconda Company, and that the revenues and expenses connected therewith should be excluded from consideration in figuring the rates for the general customers.

However, at the hearing before the court the Company showed the revenues received, expenses paid, and the return earned from the Anaconda Company on the allocation between it and the general customers. The evidence submitted shows the return earned from it was greater than that received from the general customers under the new rate. The record also shows that before this proceeding was instituted the gas rate to the Anaconda Company was increased by 61.3 per cent and the increase was approved by the Commission.

To be more specific, the evidence shows, and the Commission found, that the value of the Company's property devoted to serving the Anaconda Company as of June 30, 1954, was $13,-100,000 and that the earnings yielded a return of 6.30 per cent on that valuation.

By adding the value of the Company's property devoted to serving gas to its general customers to the value of the Company's property devoted to serving gas to the Anaconda Company, the value of the entire plant, as found by the Commission in serving all the customers as of June 30, 1954, was $44,844,-334 and on that value the Company earned a return of 5.46 per cent.

The record consists of three separate volumes of testimony and many exhibits, the substance of which need not be recited here.

It is sufficient to sustain the order of the Board when not controverted.

There is no evidence controverting the showing made by the Company.

The rule is that if there be substantial evidence sustaining the order of the Board, the courts will not interfere with its conclusion. Billings Utility Co. v. Public Service Comm., 62 Mont. 21, 203 Pac. 366; Chicago, M., St. P. & P. R. Co. v. Board of Railroad Com'r, 126 Mont. 568, 255 Pac. (2d) 346; Montana Citizens Freight Rate Ass'n v. Board of Railroad Com'r, 128 Mont. 127, 271 Pac. (2d) 1024.

Plaintiff contends that the Commission and the trial court gave too much weight to the evidence of the reproduction cost new less depreciation in ascertaining the value of the Company's property used and useful in serving the public. He relies upon the case of Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333, which he contends discredits that theory of obtaining present value.

The fallacy of his argument is that the Commission did not fix the value on a reproduction cost new less depreciation basis. That value was claimed by the Company to be in excess of $39,000,000 whereas the Commission fixed the value at $30,-000,000 when the Anaconda Company was excluded. When the property used to serve the Anaconda Company was included, the claimed reproduction cost new less depreciation, as of June 30, 1954, was $55,626,446, whereas the Commission found the value to be $44,844,334.

Our statute, R.C.M. 1947, section 70-106, provides:

"The commission may, in its discretion, investigate and ascertain the value of the property of every public utility actually used and useful for the convenience of the public. In making such investigation the commission may avail itself of all information contained in the assessment rolls of various counties, and the public records of the various branches of the state government, or any other information obtainable, and the commis-

sion may at any time of its own initiative make a revaluation of such property."

The statute is silent as to what methods the Commission must use in ascertaining the value of the property. This court has held that the value of the property means the present fair value and that reproduction cost new less depreciation is an important factor in determining the value. Tobacco River Power Co. v. Public Service Comm., 109 Mont. 521, 530, 98 Pac. (2d) 886, 890. In that case, this court said:

"'* * * Original cost, assessment values, cost of reproduction new, prudent investment theory, public records mentioned in section 3884 [R.C.M. 1935, now R.C.M. 1947, section 70-106], supra, and opinions of value are all means to an end, namely the determination of value. We can find no error in the procedure of the court in allowing evidence of cost of reproduction new, less depreciation, to be admitted as evidence of value."

So here there was submitted in addition to reproduction cost new less depreciation the original cost less depreciation and the assessed value so far as taxable property was concerned, and the record shows that the Commission examined records, referred to in R.C.M. 1947, section 70-106, and, from all the evidence, fixed the value as above noted not on any one theory of value but after considering all theories.

The Hope case is not binding upon the Public Service Commission of Montana. Its action must square with the Montana statutes and the decisions of this court. New York Telephone Co. v. Public Service Comm., 309 N.Y. 569, 132 N.E. (2d) 847; Simms v. Round Valley Light & Power Co., 80 Ariz. 145, 294 Pac. (2d) 378. The Commission under statutes such as ours has a wide latitude in choosing a method of arriving at the value of the plant used and useful in serving the public. Compare Illinois Bell Telephone Co. v. Commerce Comm., 414 Ill. 275, 111 N.E. (2d) 329; In re Diamond State Telephone Co., 9 Terry 317, 48 Del. 317, 103 A. (2d) 304; City of Marietta v. Public Utilities Comm., 148 Ohio St. 173, 74 N.E. (2d) 74; New England Telephone & Telegraph Co. v. Public Service Comm.,

148 Me. 374, 94 A. (2d) 801; Chesapeake & Potomac Telephone Co. of Baltimore City v. Public Service Comm., 201 Md. 170, 93 A. (2d) 249; In re New Jersey Power & Light Co., 9 N.J. 498, 89 A. (2d) 26; Equitable Gas Co. v. Public Utility Comm., 160 Pa. Super. 458, 51 A. (2d) 497; In re New England Telephone & Telegraph Co., 115 Vt. 494, 66 A. (2d) 135; City of Fort Smith v. Southwestern Bell Telephone Co., 220 Ark. 70, 247 S.W. (2d) 474; Birmingham Electric Co. v. Alabama Public Service Comm., 254 Ala. 119, 47 So. (2d) 449; Northern States Power Co. v. Public Service Comm., 73 N.D. 211, 13 N.W. (2d) 779.

In Application of Diamond State Telephone Co., supra, the court held it was not error for the Commission to determine the rate base by a compromise between original cost and reproduction cost.

In considering reproduction cost the Commission may, and doubtless did, consider the fact that not all the plant would ever be reproduced in its present form. Compare Chesapeake & Potomac Telephone Co. of Baltimore City v. Public Service Comm., supra.

The court was right in holding that the Commission did not err in fixing the value of the plant of the defendant, Montana Power Company, used and useful in serving its customers.

No one is questioning the rate of return allowed by the Commission in this case.

It is noteworthy that in the Hope case, so strongly relied on by plaintiff, the Federal Power Commission allowed a rate of return of 6½ per cent.

Had the Commission here allowed a 6½ per cent return it could have found a value much less than it did.

Instead of fixing the entire value as of June 30, 1954, at $44,844,334, if the Commission were to allow a return of 6½ per cent, it could have fixed the value at $37,420,000, and instead of the value of $31,410,060 as of June 30, 1954, for the valuation of the plant for serving the general customers the

Commission might have fixed a value of $24,725,320 if it thought a 6½ per cent return was reasonable.

Plaintiff contends that the company did not submit requisite ▮ information as to its cost of capital.

Information relative to shares of stock outstanding, bonds and other indebtedness, dividends and interest paid, evidence of operating expenses, capital expenditures, taxes and plant accounts for every year since 1932 were in the files in the office of the Public Service Commission.

The record shows that the Commission considered these records. Its order recites that these records were considered along with other elements in making determination of the rate of return and in arriving at what was or is a reasonable rate.

Plaintiff next contends that the Commission did not make proper findings.

The Commission's order contains seventeen findings of fact covering three pages of the transcript.

Our statutes do not require any findings of fact to be made ▮ by the Commission. Where findings are necessary their function is to inform the reviewing court of the basis of the order. Colorado-Wyoming Gas Co. v. Federal Power Comm., 324 U.S. 626, 65 S. Ct. 850, 89 L. Ed. 1235; Pacific Tel. & Tel. Co. v. Flagg, 189 Or. 370, 220 Pac. (2d) 522.

The findings made by the Commission here were adequate to inform the court of the basis of its order and are sufficient. No useful purpose would be subserved in discussing each of these findings. They cover all of the issues involved in the proceeding.

Plaintiff has pointed out that under the holding, in Petition of Public Service Coordinated Transport, 5 N.J. 196, 74 A. (2d) 580, the Public Service Commission must go beyond the books of account offered by the utility commission, and that it must get at the realities. Otherwise it is contended the statement of Mr. Justice Holmes, in City of Louisville v. Cumberland Tel. & Tel. Co., 225 U.S. 430, 32 S. Ct. 741, 742, 56 L. Ed.

1151, would come into play wherein he complained that every figure is "set down with delusive exactness."

In the Coordinated Transport case the court was criticising the Board in the following matter: "The failure of the Board to recognize that it was under a duty to go behind the figures shown by the companies' books and get at realities, is well illustrated by the fact that when, on cross-examination by an interested party, one of the principal witnesses for the companies testified that he did not know how much they had paid for a particular bus property, one of the commissioners, instead of requiring the information to be produced, cut short the inquiry into the facts by stating: 'He said he did not know. We have to accept that. He is under oath'."

Here there was no such proceeding. The Company produced evidence showing the original cost of all its property. The cross-examination of its witnesses was not restricted. It produced all the information requested or desired. Furthermore the Coordinated Transport case involved circumstances entirely different from those here. In that case the proceeding started out not as a full-fledged rate case but merely to increase the bus fare from five to seven cents to compensate for increased costs of labor. The increase was granted for a trial period. After a six months trial period it was found that the increased rate produced about twice as much increased revenue as was anticipated. Upon reopening the case the bus company then tried to sustain its increase not as it had originally done on the theory of wage increases but on the theory that it merely provided a fair return on a proper rate base. It was then sought to uphold the increase as if the original hearing was a full-fledged rate hearing. It was correctly concluded by the court that a single one-page exhibit, entitled: "Development of estimated rate base as at December 31, 1948," was not sufficient to establish the rate base contended for by it. The showing made in that case does not begin to compare with that made here .

We conclude that on the showing made before the Board it

█ █ did not abuse its discretion in granting the rate increase sought. If there be any fault with the figures submitted by the Company there must be produced some evidence to that effect. The Commission cannot be placed in error for ruling according to the only evidence before it.

The general consumers are not without remedy if in fact the present rate is excessive. In the first place, under R.C.M. 1947, section 70-119, interested parties may institute proceedings before the Commission to have the rates decreased providing a showing can be made that they are in any way unreasonable.

The question of the reasonableness of the rates is never foreclosed, but to warrant any changes evidence must be submitted. It is dangerous practice for protestants to rely solely, as is the case here, upon the weakness of the showing made by the public utility which comes forward with testimony of witnesses skilled and trained in the particular field of rate making.

Another remedy is to bring pressure to bear upon officials in Washington, D. C., to take steps to relieve the tax load which, according to the record consumes about one-half of the increase here granted.

On the record here made we would be derelict in our duty were we to hold that the lower court erred in upholding the action of the Board.

Plaintiff, relying on R.C.M. 1947, section 70-106, contends it █ was incumbent upon the Commission to make an investigation of its own before authorizing an increase in rates. This section of the statute is permissive only. It gives the Board authority in its discretion at any time and of its own initiative to make a revaluation of the property of any public utility. It need not do so if satisfied with the proof submitted to it. The district court here was bound to observe section 70-128, subd. (6), which reads:

"In all actions under this act, the burden of proof shall be upon the party attacking or resisting the order of the commission to show that the order is unlawful or unreasonable, as the case may be."

No such showing was made here.

Likewise, were we to concede that the duty of the Board to make its own investigation be mandatory, and if we assume that the duty was not discharged, there is no rule of law that permits the courts to set aside all the acts of the Board on that account.

Those facts might present grounds for removal from office if there be wilful refusal or neglect to perform the duties, R.C. M. 1947, section 94-5516, but under no principle of law, of which we are advised, is there any authority on the part of the court to nullify the action of the Board for failure to make independent investigation where the evidence submitted to it justifies the order made.

It would be an unheard of holding to say that plaintiff attorney general sustains the burden of proving that the rates are unreasonable as alleged by merely showing that his client, the Board of Railroad Commissioners, section 72-124, failed to call as witnesses, its engineers, examiners, experts, accountants and other assistants provided for by R.C.M. 1947, section 70-118.

Were the dissenting opinion to become law, then if the personnel of the Board produced evidence differing from that of the utility and if the Board must stand between the public and the utility then seemingly it would be obliged to accept the testimony of its own personnel to the exclusion of that furnished by the utility company, and the hearing provided for by law would become a hollow mockery, and an empty gesture lacking in essentials of due process of law.

The trial court properly ruled according to the only evidence before it.

The judgment is affirmed.

MR. JUSTICE BOTTOMLY (dissenting).

Here we have an application by plaintiff corporation, before the Public Service Commission for an increase in its rates and charges. A public hearing was held and a number of corpora-

tions, associations, individuals and labor organizations appeared as protestants of such increases. It is apparent from the record that the Commission granted the increased rates entirely on the evidence submitted by the corporation, as very little evidence was introduced by the protestants. However, the Commission granted in full the schedule of maximum increased rates requested by the Montana Power Company.

The protestants in such cases generally as here are not in a position or able financially or otherwise to go into all the technical questions necessary to bring before the Commission the facts as to exactly what constitutes a reasonable, just and fair rate under existing conditions. Neither should they be expected nor required to do so, especially where the people of Montana have through their Legislature, provided for a *Public Service Commission* which is maintained at public expense and which should fairly represent the public interest and *stand between the public and the utility,* and upon which the duty, power and authority is granted and imposed when determining and allowing reasonable rates to be charged by the monopoly, to see to it that such rates be fair and just both to the public and the monopoly. This is the only justification for the public maintaining a Public Service Commission.

R.C.M. 1947, section 70-101, created the Commission.

R.C.M. 1947, section 70-103, invests it with full power of supervision, regulation, and control of the utility.

R.C.M. 1947, section 70-105, provides that every unjust and unreasonable charge by the utility is prohibited and declared unlawful. The rate increase granted in the instant cause is therefore contrary to the public policy of the State of Montana.

R.C.M. 1947, section 70-106, grants to the Commission the power and authority to investigate and ascertain the value of the property of every public utility used for the convenience of the public. Also granted to the Commission are broad powers in the use of all information contained in assessment rolls, public records of the branches of state government, including the public records of the State Board of Equalization, and any

other information obtainable and the Commission may at any time *of. its own initiative* make a revaluation of such utility's properties.

R.C.M. 1947, 70-109, grants authority to the Commission to examine the books, accounts, records and papers of any public utility.

R.C.M. 1947, section 70-121, provides that if, upon *due investigation* and hearing, the Commission finds that the rates, tolls, charges, schedules, or joint rates be unjust, unreasonable, or unjustly discriminatory, or to be preferential or otherwise in violation of the provisions of R.C.M. 1947, Title 70, chapter 1, the Commission shall have the power to fix and order substituted therefor, such rate or rates, tolls, charges or schedules, as shall be just and reasonable.

The Commission in expressing its power of regulating rates of a utility corporation must itself make its *due investigation* and appraise the value of the utility's properties, determine for itself the costs of operation, allow for depreciation, and designate a rate or rates that allow a fair return on the actual bona fide investment.

It is the duty of the Commission to limit and regulate the use of the property, so far as profit and quality of service rendered is concerned.

When the Commission simply sits as an automaton, without exercising its own initiative in determining all these factors by and through its own engineers, examiners, experts, accountants and other assistants provided for the Commission by R.C.M. 1947, section 70-118, and simply takes the testimony of the utility on such matters and questions, the Commission is not, in my opinion, fulfilling its duties and responsibilities to the public under the law of its creation.

By reading the whole of Title 70, Public Utilities, chapter 1, R.C.M. 1947, it seems clear that the intent of the Legislature was that the State Public Service Commission would, through its own agents, make full disclosure of all matters under consideration, so that the members of the Commission could then

check and weigh the facts developed by its own due investiga-
tion as against the evidence produced before it by a utility.

It appearing that the Public Service Commission failed and
omitted to make any independent investigation herein as is
provided for and required by the above statutes, I would re-
verse the judgment and send the matter back to the Commission
to enable it to fully perform the duties so imposed upon it and
thus allow it *to make* its own investigation and determination
of the facts and circumstances before approving or allowing
any rate increase whatever.

MR. JUSTICE ADAIR:

I concur in the dissenting opinion of Mr. Justice Bottomly.