INC. TOWN OF EMERSON *v.* ARK. PUBL. SERV. COMM.

5-1098                                           295 S. W. 2d 778

Opinion delivered December 3, 1956.

*McKay, McKay & Anderson* and *Lasley & Lovett,* for appellant.

*John R. Thompson, H. W. McMillan,* and *Chas. C. Wine,* for appellee.

MINOR W. MILLWEE, Associate Justice. This is an appeal from a judgment of the Pulaski Circuit Court dismissing a petition to review an order of the Arkansas Public Service Commission, hereinafter called "Commission." Appellants, who were the petitioners and intervenors below, are Union Telephone Company and the town of Emerson, Arkansas, and will be respectively referred to as "Union" and "Emerson."

Ray Bradley owned and operated the Emerson Telephone Exchange under a franchise from Emerson and an indeterminate permit from the Commission on June 11, 1951, when he applied to the Commission for a certificate of convenience and necessity to furnish telephone service to a "rural area"[1] in Columbia County which embraced Emerson and adjacent rural territory including the smaller rural communities of Atlanta, Mt. Pisgah and Walkerville.

Southwest Arkansas Telephone Cooperative, Inc., hereinafter called "Cooperative" is a non-profit telephone corporation organized under Act 51 of 1951 (Ark. Stats. Secs. 77-1601 to 77-1639) for the purpose of engaging in and furnishing telephone service to rural areas. On July 22, 1953, Cooperative secured an option from Mrs. Ray Bradley and T. H. Bradley, owners of the Emerson Telephone Exchange, to purchase said exchange and telephone properties for $7,000.

On February 18, 1954 the Commission approved Bradley's application and entered an order issuing a certificate of convenience and necessity to service the rural area in question. On June 7, 1954, the town council of Emerson, which had a population of 523, passed an ordinance granting a franchise to Cooperative to con-

---

[1] By Ark. Stats. Sec. 77-1602 (9) "Rural Area" means any area located outside the boundaries of any town, city or village having a population in excess of 2500.

struct and maintain a telephone exchange in the town. On July 20, 1954, Cooperative exercised its option to purchase from the Bradley's subject to approval of the Commission. On November 11, 1954 the Emerson council repealed the ordinance passed June 7, 1954, because Cooperative had not filed written acceptance of the franchise within 90 days.

On December 6, 1954, the Bradleys and Cooperative filed their joint application with the Commission requesting approval of the sale of the Emerson Telephone Company to Cooperative together with all rights granted the Bradley's under their certificate of convenience and necessity. This was done after a detailed engineering study and economic feasibility survey of the area in question had been made. On March 2, 1955, Union filed with the Commission its petition to reopen and set aside the order for allotment of the area to Bradley issued on February 18, 1954, and for the reallocation of said area to Union instead. On March 2, 1955, Union also filed its petition to intervene in the joint application of Cooperative and the Bradleys and requested its dismissal on the ground that it was contrary to the public interest. On April 12, 1955, Emerson filed an intervention joining in the request of Union. The various applications, petitions and interventions were consolidated for a hearing before the Commission which began May 10, 1955, and lasted for several days.

On June 16, 1955, the Commission entered an order approving the joint application of Cooperative and the Bradleys and denying the petition and application of Union. In approving allocation of the area in question to Cooperative as being in the public interest and granting it a certificate of convenience and necessity to construct and maintain telephone facilities in the area, the Commission made extensive findings. It found that Union did not propose to render telephone service to the entire area in question as proposed by Cooperative; that the agreed sale price of $7,000 was considerably more than the actual value of the properties involved; that the total price should not be reflected in the rate base of

Cooperative which would be required to enter $3,500 thereof in a surplus account, and that the balance over and above the value of the properties remaining in service after reconstruction should be amortized over a period of 10 years by charges to operations; that the fee of $50.00 which Cooperative proposed to charge new members is unreasonably high and a uniform fee of $10.00 is reasonable and adequate for all members; and that it is in the public interest to allow Cooperative to issue membership certificates, capital stock and evidences of indebtedness necessary to secure a loan of $294,000 by the United States through the Rural Electrification Administration for construction of the facilities.

The evidence also discloses that for the past several years the properties of the Emerson Telephone Company have deteriorated and that the service is poor. Service to some former patrons in the area adjacent to Emerson had been discontinued and many others in that area desired service. Citizens in and outside of Emerson held several mass meetings at which prospective telephone patrons "signed up" for membership in Cooperative and offered to subscribe for its stock. At one meeting 114 signed and paid a $10.00 deposit on the membership fee requested by Cooperative. The citizens of Emerson had become impatient for improved service in the Fall of 1954 when Union first became interested in the project and a mass meeting was held in Emerson attended by about 75 people at which representatives of Union and Cooperative spoke and there was a vote taken with 34 voting in favor of Union and 10 for Cooperative. Shortly thereafter the town council of Emerson granted a franchise to Union subject to approval of the Commission.

Union is an established company and operates exchanges in several towns in three counties with about one-third of its 2,150 phones in rural territory. Its schedule of proposed rates was slightly lower than those proposed by Cooperative but the latter's coverage of the less populous rural territory adjacent to Emerson was substantially more complete. Union's president testified that a considerable portion of this area could not be

served upon any favorable or economical basis. Both applicants intended to reconstruct the entire facilities in Emerson and the adjacent area under contracts let upon competitive bidding and on borrowed capital which was available to Cooperative from the REA at a substantially lower rate of interest than Union planned to pay the banks. While there was some evidence that the existing facilities of the Emerson exchange were worthless and useless, the president of Union placed a net value of $2,517 on the properties and there was other evidence that a part of the equipment could be used in reconstruction and expansion of the facilities.

Cooperative owns and operates four exchanges in Miller County near the area in question under authority granted by the Commission in 1952. While its financial statement of December 31, 1954, showed an excess of $11,000 in liabilities over assets, it earned $644 after expenses during the first quarter of 1955 and prospects for future earnings were considered favorable. Union's net earnings were greater and its investment per station was considerably less than that anticipated by Cooperative. Union estimated it would have 180 telephone customers in the area it proposed to serve in five years after cutover to dial service while Cooperative estimated it would have 320 customers in the broader area it proposed to serve at that time.

Appellants filed their appeal or petition to review the Commission order in Pulaski Circuit Court pursuant to Ark. Stats. Sec. 73-233. The instant appeal is from the circuit court judgment of May 22, 1956, dismissing appellants' petition and finding that the Commission had regularly pursued its authority; and that no constitutional rights of the appellants had been violated.

It is well settled by our decisions that the Commission is clothed with broad legislative and administrative powers and that a review of its findings and orders by either the circuit court or this court, on appeal, is considerably limited in its extent. Ark. Stats., Sec. 73-233 (d) provides that such review shall not be extended further than to determine whether the Commission has reg-

ularly pursued its authority, including a determination of whether the order under review violated any right of the complainant under the U. S. or State Constitutions. However this does not mean that the courts cannot inquire beyond mere formality when other provisions of the statute are considered along with Sec. 73-233, *supra*. In this connection we have repeatedly held that if the Commission's order is supported by substantial evidence, free from fraud, and not arbitrary, it is the duty of courts to permit it to stand, even though the courts might disagree with the wisdom of the order. *Department of Public Utilities* v. *Arkansas-Louisiana Gas Co.,* 200 Ark. 983, 142 S. W. 2d 213; *City of Fort Smith* v. *Southwestern Bell Telephone Co.,* 220 Ark. 70, 247 S. W. 2d 474; *Arkansas Power & Light Co.* v. *Arkansas Public Service Commission,* 226 Ark. 225, 289 S. W. 2d 668.

While appellants do not contend the order under review violated their constitutional rights, they insist that it is unreasonable, arbitrary and illegal; and that the findings set out therein are not supported by any evidence. Appellants say the Commission exceeded its statutory authority in authorizing Cooperative to issue notes and other evidences of indebtedness; that under the undisputed evidence Cooperative is hopelessly insolvent; and that the order is particularly arbitrary as applied to the people of Emerson proper because they will have to wait longer for improved service and pay higher rates than would be the case if the application of Union had been approved.

The principal purpose of the Legislature in the enactment of Act 51, of 1951 is perhaps best expressed in the emergency clause (Sec. 41) which reads: "It is found that there are many rural areas, as herein defined, in the State of Arkansas without local telephone service; that the Federal Government has made provision for the financing of cooperative non-profit corporations for the purpose of furnishing telephone service to said areas; that there is an urgent demand from those living in said areas for telephone service; that there is no provision for the organizing of such corporations for said

purpose; and that this act is necessary for the preservation of the public peace, health, and safety, an emergency is therefore declared, and this Act shall take effect and be in force from and after its passage.''

Regardless of our own appraisal of the wisdom of the Commission's order, we conclude that it is supported by substantial evidence and that it is not based on arbitrary or illegal action. It is understandable why the inhabitants of Emerson proper now prefer the services of Union and if their interests alone were at stake we might readily agree that the Commission acted both unwisely and arbitrarily. It is also easy to understand why Union can offer more attractive rates by declining to serve a substantial portion of the less populous rural territory, adjacent to Emerson. The problem of the Commission was to determine the best interests of the people of the whole area in question. Viewed from that standpoint its findings and conclusions are supported by substantial evidence. The judgment of the circuit court is accordingly affirmed.