CITY OF EL DORADO *v.* ARK. PUBLIC SERVICE COMM.

5-2707                                    362 S. W. 2d 680

Opinion delivered December 3, 1962.

[Rehearing denied January 7, 1963.]

814

*J. V. Spencer, Jr.,* for appellant.

*Mehaffy, Smith & Williams,* by *Pat Mehaffy* and *Herschel H. Friday, Jr., R. H. Thornton, Jr.* and *Mark Woolsey,* for appellee.

PAUL WARD, Associate Justice. This appeal comes from a judgment of the Pulaski County Circuit Court which affirmed an order of the Arkansas Public Service Commission. Said order related to a controversy between the Arkansas Louisiana Gas Company and the cities of El Dorado and Pine Bluff. One reason for the cities involvement was that the Arkansas Louisiana Gas Company was attempting to raise the minimum monthly service charges on certain domestic customers' meters from $1.17 to $1.87. Hereafter we may refer to the Arkansas Public Service Commission as "Commission,"

to the Arkansas Louisiana Gas Company as the "Company", and to the cities as appellants.

*How the litigation arose.* In 1957 the Commission asked the Company to present certain facts with respect to the various municipal taxes paid by the Company to municipalities throughout the state. No further steps appear to have been taken until early 1961 when the Company filed a petition with the Commission stating it was prepared to present the requested information, and also asking the Commission to examine and adjust the minimum service charges on certain customers' meters. In the hearings that followed it was developed (generally speaking) that some cities were taxing the Company meters nothing, others a small amount, and others a much larger amount. It was also developed that the Company had fixed a monthly minimum charge of $1.17 on each meter in certain cities (Group A), a greater charge on cities in another group and no charge in still another group. The Company asked to raise the charge in Group A to $1.87 and to lower the higher charges to $1.87. This adjustment, approved by the Commission, resulted in an increase of revenues for the Company. Appellants took the position that the Company could not justify raising the minimum service charge without showing it would not result in earnings of more than 6.34% on its over-all operations. This percentage of return was apparently agreed to by the parties, and it was found to be fair in *Acme Brick Company* v. *Arkansas Public Service Commission,* 227 Ark. 436, 299 S. W. 2d 208. To meet this burden the Company showed that because of a labor wage scale increase (over which it had no control) its operating expenses had increased by $200,000 annually. Also the Company, in order to meet the burden, asked the Commission to make certain adjustments necessitated by the unusually severe weather experienced in 1960. Other adjustments were also asked to be made in order to determine whether the Company was making more than 6.34% on its investment. It should be noted at this time that the purpose of these extensive proceedings, shown in a record of seven volumes, was not primarily to reduce

or increase gas rates generally. The extensive hearing became necessary, however, because appellants insisted (and the Commission agreed) that the Company would not be entitled to any additional revenues without first disclosing its over-all revenues and expenses pertaining to its operation in Arkansas, as applied to the Company's services to distribution customers as distinguished from industrial customers. This procedure was approved in the *Acme Brick Company* case, *supra*, where we said: ". . . it is necessary for the Commission to allocate or apportion the joint costs of transmitting gas from the well to customers according to each class of customer's responsibility therefor."

It is the Company's contention, after making a full disclosure of its pertinent operational revenues and expenses, that its net income does not exceed the 6.34% return.

Appellants challenge several items of expense and income claimed by the Company and allowed by the Commission, which items we will later examine.

*Fundamental Rules.* Before proceeding to discuss the merits of the aforementioned items it is deemed appropriate to restate briefly some of the well established fundamental rules, as we conceive them to be, by which we must be guided.

(a) It is the duty of the Company to operate in such manner as to give to the consumers the most favorable rate reasonably possible. This stems from the fact that the State has given the Company the exclusive right to sell and distribute gas to its customers. Consequently the Company bears a trust relationship to its customers and must conduct its operations on that basis and not as if it were engaged in a private business with no restrictions as to the income it could earn.

(b) In a hearing of this nature the burden is on the Company to justify any rate increase requested from the Commission. See: *City of Fort Smith* v. *Southwestern Bell Telephone Company*, 220 Ark. 70, 247 S. W. 2d 474. This in part stems from the nature of its relation-

ship just mentioned and also from the fact that it has possession of all pertinent records. If the burden were not on the Company, aggrieved cities or persons would be greatly handicapped for lack of funds, organization, and access to material information.

(c) The Commission, with its training and personnel, performs the function of weighing and passing on the facts presented to it, and in that field its findings are like those of a jury and must be allowed to stand if based upon substantial evidence, free from fraud and not arbitrary. See: *Inc. Town of Emerson* v. *Ark. Public Service Commission*, 227 Ark. 20, 295 S. W. 2d 778. As we see it, the Commission has two distinct duties: One is to the Company to see that it may charge such a rate as will give it a fair return on invested capital; The other is to see that the consumer shall not pay more than necessary to produce such fair return. If, however, the Commission misapplies any principle of law in reaching its conclusions they are subject to reexamination by this Court.

Since the records, as introduced in evidence by the Company and interpreted by the Commission, reveal no excess earnings, it is incumbent on us, as we examine the several points relied on by appellants, to seek the correct answers to two questions: One, did the Commission make any conclusion of fact which is not supported by substantial evidence; and, Two, did the Commission, in reaching any conclusion, violate any principle of law or approved procedure?

For convenience and clarity we choose to discuss the numerous objections raised by appellants under two principal classifications: *One,* dealing with substantial evidence; *Two,* dealing with law or proper procedure.

### One.

In the following discussion each of appellants' points is quoted from their brief.

(a) "The Order of the Commission is Arbitrary, Unreasonable and Without Evidentiary Support in

Eliminating $2,640,000 of Actual Revenue on Account of 'Weather' ''.

In line with appellants' insistence throughout the hearing that the Company had no justification for raising certain minimum fixed charges, it is contended that the Commission erred in adjusting the Company's income because of the weather conditions in 1960. The undisputed evidence shows that the Company did have a sizeable increase in revenues for that year due to the increased sale of gas. Evidence was introduced to show that this increase amounted to anywhere from $4,208,088 (as contended by the Company) to $1,667,960 (as reflected by Exhibit 4 of appellants) as compared to an average over the past 14 years. After due consideration the Commission fixed the allowable figure at $2,640,-000.00. We cannot say that this figure fixed by the Commission is not supported by substantial evidence. In this connection it is pointed out, also, that the evidence showed that the Company, due to the same factor, had an increase in expenses in the amount of $848,978 for the year 1960 over and above the average expenses for the past 14 years. In reaching its final conclusion the Commission took into consideration both the increased revenues and the increased expenses. Due to the self-evident fact that utility rates cannot be adjusted from day to day, but are made for the foreseeable future, we think the action of the Commission in this instance was proper and fully justified under rules established not only by our own Commission but by the decisions in other states. The record discloses that on two previous occasions the Commission adjusted rates based on weather conditions.

See: Re: *Public Service Company of Colorado*, 34 P.U.R. 3d 186 (1960); *Re Plateau Natural Gas Company*, 36 P.U.R. 3d 452 (1960); *Re Diamond State Telephone Company*, 28 P.U.R. 3d 121 (1959); *Re Gas Light Company of Columbus*, 31 P.U.R. 3d 350 (1959); *Re Columbia Gas of Kentucky*, 36 P.U.R. 3d 401 (1959); and *Re Central Maine Power Company*, 29 P.U.R. 3d 113 (1959).

(b) "The Commission Order is Arbitrary, Unreasonable and Without Evidentiary Support in Eliminating over $4,000,000 Products Extraction Income."

The record disclosed that the Company wholly owns the Arkansas Louisiana Chemical Corporation (hereafter referred to as "Arkansas") which engages in many activities among which is extracting and processing the liquid hydrocarbons from natural gas. It is further shown that the Company permits Arkansas to extract the liquid hydrocarbons from much of the gas which is distributed to its customers. In this process Arkansas derives considerable profits. It is the contention of appellants that these profits should be added to the Company's overall revenues. If this were done of course it would tend to reduce the customers' rate. The Commission allowed Arkansas to retain the profits. In the case of *Associated Mechanical Contractors of Arkansas, Etc.* v. *Arkansas Louisiana Gas Company*, 225 Ark. 424, 283 S. W. 2d 123, we put the stamp of approval on the participation of the Company in a private business. The last paragraph of the cited case makes it clear, we think, that although a utility may own or engage in a private business and retain the profits therefrom for the stockholders, none of the expenses incidental thereto can be charged to the utility customers. In connection with the point under consideration there is substantial evidence to show that all expenses incurred by Arkansas in its operations are charged to Arkansas and not to the utility customers. We understand from appellants' argument they contend the cost of transporting the gas from its source to Arkansas' plant is borne by the utility customers and not by Arkansas. It is pointed out, however, that insofar as we can tell, this cost would accrue whether the gas is processed or is piped directly to utility customers. Therefore no error is shown in the Commission's findings. It is pertinent, however, in this connection to point out that it would be error for the Commission to charge the customers with any expense which contributed solely to the profit of Arkansas. It is also the duty of the Company to keep its books

in such a way as to be able to inform the Commission so it could make a proper ruling in a situation like this.

(c) "The Commission Order is Arbitrary, Unreasonable, and Without Evidentiary Support in Eliminating $1,054,432.71 of Income From Gas Transported for Others."

It is disclosed by the record that the Company transported gas, using its distribution system, for other persons or corporations and derived therefrom in revenues the amount of $1,054,432.71. There is substantial evidence to support the Commission in finding that the reasonable expense of transportation amounted to $425,523 and that the distribution customers were given credit for this amount by reducing the rate base by $3,889,557. This, of course, resulted in a profit of $629,000 for the Company or the stockholders. It is insisted by appellants that the latter amount should inure to the benefit of the customers and not to the benefit of the stockholders as held by the Commission. In this we think appellants are in error because as we have already pointed out, the Company has a right to engage in nonutility operations and keep all of the benefits derived therefrom as long as it pays all the expenses incidental thereto.

(d) "The Commission Order Is Arbitrary, Unreasonable and Without Evidentiary Support in Eliminating $2,563,078 of Income from Sales to Other Gas Utilities."

What we have already said disposes, we think, of appellants' objections here considered. It appears that in 1960 the Company purchased gas for the sum of $5,-761,994 and resold it to other gas utility companies for $8,294,952 resulting, apparently, in a profit of $2,532,958. Under the ruling of the Commission this profit inured to the Company or the stockholders and not to the benefit of the customers. This was in line with eliminating all expenses and all income relative to these non-utility sales in like manner as previously pointed out. This was also in accord with the previous ruling of the Commission in *Re Arkansas Louisiana Gas Company,* 97 P.U.R.

(n.s.) 67 (1952) where, it is pointed out the Commission in considering a similar question said:

"The sales from the 'nonutility' sales are all sales to other utilities. They are not sales to ultimate consumers, but are 'sales for resale'.

"We hold, therefore, that while such properties are utility in nature that they should be excluded from the determination of the rate base, and similarly from revenues and expenses applicable to the 3-B customers."

The only way we can see how the Company's distribution customers might be adversely affected would be for the Company to sell its gas at a lower rate than that which it charges the customers or to deplete its available supply of gas to a point where the customers might be eventually affected. In the case of *Federal Power Commission* v. *Sierra Pacific Power Company,* 350 U.S. 348, 100 L. Ed. 388, 76 S. Ct. 368 (1956), the Court in discussing a similar situation said:

"In such circumstances the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest — as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory."

There is no showing here that such a result has come about from the Company's sale of gas to other utilities.

(e) "The Commission Order is Arbitrary, Erroneous and Without Evidentiary Support in Allowing 'Fictitious' Income Taxes as an Expense of the Company."

We have carefully considered appellants' contention that the Commission erroneously allowed the Company to withhold money for the purpose of paying income taxes without deducting therefrom what is designated as "fictitious" income taxes which it will never be called on to pay. To fully understand this contention necessitates a consideration of Act 175 of the Acts of 1957. Generally speaking the effect of this act was to take cer-

tain gas producing properties out of the rate making base and allow the Company to charge its customers the fair field price. Appellants point out that the production properties, when considered for income tax purposes, are subject to certain income tax deductions detailed as follows: (1) abandoned lease and non-producing well drilling $727,000; (2) depletion, gas $1,904,000, and (3) intangible well drilling expense $2,667,000. It is appellants' contention that these sums should be deducted from the amount withheld by the Company for payment of income taxes. In this we think they are in error. We think the effect of Act 175 of 1957 was to disassociate the Company owned oil and gas production properties from all consideration in connection with rate making. That is the effect of the Commission's holding and that is clearly the contention of the Company. We quote from the Company's Brief at page 175 the following:

"The producing arm of the Company is accorded the same treatment as a third party producer selling gas to the Company. Both must pay, from the dollars appropriate to the value of the product, all expenses connected with drilling producing wells [and] all losses of 'dry holes'."

We understand this to be a commitment by the Company that hereafter all expenses incurred in developing its oil and gas operations and all losses resulting therefrom, will be paid and sustained by the Company stockholders and not by the utility customers. In other words, the result of Act 175 is that from here on the rate payable by gas customers will in no way be affected by the success or failure of said oil operations. That being true, it is immaterial to the Company's customers whether the Company's stockholders pay taxes on the oil production properties or not or whether they take depletion allowances or not. Under this view the Commission was correct in refusing to require the Company to take the allowable deductions mentioned from the amount withheld for the payment of income taxes. Except for this failure on the part of the Commission, we understand

that appellants have no objections to the amount withheld by the Company.

(f) "There Is No Substantial Evidence of Any Discrimination and No Allocation to Group A Customers."

By order of the Commission the monthly minimum fixed charge per meter was fixed at $1.87 for customers. Previously the fixed minimum charges varied in different towns. In towns on the integrated system (towns served by the main line distribution system) the charge had been $1.17. This class of town is also designated as Group A towns. In another group of towns the charge had been $1.50; in another it was $1.90; in another it was $2.00; and in others it was $2.50.

The reasons, as we understand them, given by appellants may be stated in the following way:

1. In Group A towns the average service expense per customer (or meter) is lower than $1.87, so there is no justification for the increase in that group.

2. In the other towns the average service expense is much greater than $1.87. This would therefore result in the towns in Group A subsidizing the other towns.

3. Due to the fact that there are a great many more customers in Group A towns than there are in the other towns, resulting in increased revenues, the Company would not be entitled to the increased revenues without first showing it would not earn more than 6.34% on its fixed base rate.

The answer to the last argument is that it has been shown elsewhere in this opinion that the Company will not be earning more than the allowed rate. The answers to the other arguments are found, we think, in facts and considerations presently set out.

It must be understood that the Commission, in approving a fixed minimum charge, has many things to take into consideration. In making a determination it would be unreasonable to expect it to fix a charge that would eliminate all inequities. This fact was recognized in *Ogden City* v. *Public Service Commission,* 123 Utah 437,

260 P. 2d 751, 123 Utah 443, 260 P. 2d 754, where the following statements are found:

"The order of the Commission is not only an exercise of its legal authority, but appeals to basic equities—at least eliminating one discrimination in a field where it is impossible to eliminate them all.

"Public policy seeks the elimination of as many discriminations as possible in a field where total elimination thereof is difficult or impossible of achievement. * * * "

It must be realized also that the Commission must consider not only the facts as they exist on any given date, but it has the right to consider what conditions may be in the foreseeable future. For instance, the expert evidence shows that the monthly distribution expense, in Group A towns, was more than the $1.87 allowed by the Commission (or $1.95) and that in 1961 it would likely be $2.04. We must agree with appellants that there appears to be a discrimination against the Group A towns and in favor of the non-integrated towns since it costs more per meter to serve the latter than it does the former and yet all customers pay the same minimum charge. But there are other things which the Commission had a right to consider. Some of the non-integrated towns floated bond issues and installed their own distribution systems without cost to the Company. This of course voided the necessity of increasing the Company's rate base when in turn it inured to the benefit of all gas customers. In addition, it was shown that the cost of furnishing gas and services to the non-integrated towns was so high that were they forced to pay their numerical proportion of same, they would be required to pay almost prohibitive rates. In our opinion the Commission had a right to consider that feature in arriving at a proper minimum charge which would enhance the development and general welfare of the entire state. This right may reasonably be inferred from the language used by the legislature in Act 175 of 1957, section 3.

In view of all we have said above we are unable and unwilling to say the Commission acted arbitrarily

or without the support of substantial evidence in fixing the minimum monthly service charge at $1.87 per meter.

### Two

The remaining points or objections are distinguished from the ones previously discussed in that they deal primarily with questions of law or proper procedure while the others involved primarily questions of substantial evidence.

(a) "The Commission Order Is Arbitrary, Erroneous and Contrary to Law in Allowing Loss From Merchandising and Jobbing as a Utility Expense, and in Failing to Assign Cost to Arkansas Louisiana Finance Company."

The record reveals that the Company engages in certain forms of merchandising, sales promotion and advertising. Appellants do not appear to question the legal right to engage in these activities, nor would they be justified in doing so. In the case of *Associated Mechanical Contractors of Arkansas, Etc.* v. *Arkansas Louisiana Gas Company,* 225 Ark. 424, 283 S. W. 2d 123, we held that the Commission had no authority to prohibit the Company from selling and installing air-conditioning equipment.

However, appellants do contend that the expenses incidental to such merchandising should not be allowed as a utility expense. The great weight of authority appears to be against such contention. See *West Ohio Gas Company* v. *Public Utilities Comm. of Ohio,* 294 U. S. 63, 55 S. Ct. 316, 79 L. Ed. 761 (1935); *Consolidated Gas Company of New York* v. *Newton,* 1920 F P.U.R. 483, 267 F. 231 (2 Cir. 1920); *Public Service Company of New Hampshire* v. *New Hampshire,* 30 P.U.R. 3d 61, 102 N.H. 150, 153 A. 2d 801 (1959); and *Wichita Gas Company* v. *Public Service Commission,* 1928 D P.U.R. 124, 126 Kan. 220, 268 P. 111 (1928). The record reflects that the Company engages in merchandising only such items that are related to its utility business and would tend to increase the sale of gas. So, we hold that the Commission had the authority to permit the Company to charge to utilities ex-

pense proper items of merchandising, and that it did not act arbitrarily in doing so on the reasonable theory that increased gas sales would tend to lower the price paid by consumers. Based on the same reasoning the Commission correctly allowed the expense of Company advertising to be charged to utilities expense.

Notwithstanding the above, appellants properly argue that the Company has no right to make improper charges, i.e., charges which do not promote the interest of the consumers. One argument is based on the expenses incurred, and allowed, in connection with the operation of the Arkansas Louisiana Finance Company which is wholly owned by the Company. It is pointed out that the finance company makes a profit which inures to the stockholders (in effect) but that certain expenses of operation—such as billing and collecting—are charged to utility expenses. In other words, it is pointed out that the stockholders get all the profits and the consumers pay part of the expense. We think appellants' contention in this connection would have merit if the finance company were engaged in serving the general public, but as we understand from the record, this is not the case. The finance company handles only the accounts of customers who buy gas-using-equipment from the Company. Such being the case we conclude the Commission, under its broad discretionary powers, had the right to treat this item on the same basis as it did the items of merchandising and advertising—that is, all the activities tended to promote an increase in the sale of gas.

(b) "The Commission Order Is Arbitrary, Erroneous and Contrary to Law in Failing to Consider 'Overall' Company Operations."

Under this point appellants say it was arbitrary and unlawful for the Commission (in reaching its several conclusions) to fail and refuse to consider the Company's "over-all" operations. We agree with the general principle announced in 73 C.J.S., *Public Utilities* § 13, page 1008, that:

"According to many decisions, a public utility is entitled to charge and receive for its product or service

such rates, and such only, as will give it as profit a fair return on the reasonable value of its property at the time used and useful in the public service. . . ." It is pointed out by appellants that the Commission failed to consider several items of revenue accruing to the Company, which items, in view of the conclusion hereafter reached, we deem it unnecessary to set out in detail.

We can also agree with appellants contention that the Commission would have no right to grant the Company an increase in minimum fixed charges if, to do so, the Company's earnings would exceed the allowable return—in this case fixed at 6.34%. We can readily understand how appellants were led to think, during the hearing, that the Commission was going to give consideration to the Company's over-all revenues and expenses. In spite of all we have said, however, we are forced to conclude, from a full examination of the entire record, the Commission did not intend to (and did not in fact) give full consideration to the Company's operation as it pertained to industrial customers, but only to its operation pertaining to distribution customers. In this, we think, the Commission acted correctly within its discretionary powers based on sound reason and in accord with precedent. See: *Acme Brick Company* case, *supra*. There are sound reasons for separating the income and expense referable to industrial customers from distribution customers. It was also stated in the *Acme Brick Company* case, *supra*, that industrial customers use "approximately 80% of all gas passing through the Company's lines". It is not unreasonable to assume this percentage may increase as the state becomes more industrialized. To supply this volume of gas and for the Company to give to industrial consumers contractual assurance of an adequate supply at a stabilized price, it is understandable that the Company must make long range purchase contracts. This could mean that a profit or a loss would result. It has been properly said that a utility exists primarily for the benefit of distribution customers. We think the Commission can therefore properly determine that it

would not be to the best interest of the distribution customers for them to run the risk of absorbing the losses the Company might incur in servicing industrial customers. It must logically follow, therefore, that the Commission should not compel the Company to give to the distribution customers any profits that might likewise accrue. We conclude therefore that appellants had no right to demand an over-all accounting in this particular proceeding. It is also pointed out that both sides agreed that the proper rate was 6.34% as fixed in the *Acme Brick Company* case, *supra*.

(c) "The Order of the Commission Is Clearly Arbitrary, Unlawful and Erroneous and Without Substantial Evidentiary Support in Allowing a 'Field Price'."

The point is here made that the Commission acted unlawfully and without evidentiary support in allowing a "fair field" price. We can find no merit in this contention. Act 175 of 1957 (Ark. Stats. § 73-1903) fixes the method to determine the price which the Company can charge (as an operating expense) for the gas purchased from its own gas wells. It is "the fair value or reasonable market price of such natural gas at the point at which the gas is delivered into the transmission system" of the Company, "or within the vicinity of the field or fields where produced".

The method used in this instance was to average the price at which several sales were made. By the Company's calculations the average was 18.74 cents per MCF; other calculations by appellants resulted in an average of 14.26, and the Commission fixed the price at 16.57. The contention is made that some of the Company's prices were based on gas sold, not at "the transmission system", but at other points after it had been transmitted for some distances (not shown) through the Company's system. In principle we are in agreement with the above contention. We think the clear intention of the statute (above quoted) is that the price of gas was not to be determined at some distant place after it is transported in the Company system. Otherwise, the distribution

system would be used for Company benefit by the use of utility property—or at the expense of the distribution customers. We cannot, however, say this was done in this instance, or that the Commission did not consider that factor. The Commission's findings show conclusively that they were aware of the correct procedure. The Commission refused to allow the price of 18.74 based on the Company's calculations and it allowed more than 14.26 based on the appellants' calculations. The Commission pointed out, however, that some of the sales in appellants' calculations included sales made some time previously and therefore were not true indications of the present price. In view of all we have said above we are unable and unwilling to say that the Commission, in fixing the price it did, acted arbitrarily, unlawfully, or without substantial evidence.

(d) "The Commission Order Is Clearly Arbitrary, Unlawful and Erroneous in Using a Year Ending Rate Base Without Adjusting Revenues to Year End Levels and Without Crediting Against Rate Base Income Tax Accruals."

Apparently it is not argued that the Commission had no authority to fix a rate base predicated on year-end figures of plant investment, but it is insisted that in doing so, it must consider year-end revenues and expenses, citing the Commission's holding in its own case, 7 P.U.R. 3d 561, 563 (Docket U-905). The answer to this objection is that we cannot say the Commission did not take into consideration (along with other factors later mentioned) the year-end level of both revenues and expenses in fixing the rate base in this instance. Only two expert witnesses, Clayton and Flanders, made calculations for the Commission's consideration relative to a proper rate base. Clayton's figure, the smaller of the two, was the one adopted by the Commission.

In adopting the figure most favorable to the rate payers, the Commission had the prerogative and the duty to consider a variety of pertinent items which have been approved not only by this Commission but by court de-

cisions. Some of these items are: Rates and bases must be made, not for a day or a month, but for the foreseeable future; It is common knowledge that prices for labor and materials (for operation and construction) have advanced in the past few years and probably will advance in the years ahead; and to meet the growing demand by the public for a better and expanded service the Company must be prepared financially to provide these services. The Commission, as shown by its order, took these and other items into consideration in fixing the rate base at $36,756,234, and we are in no position to say, with confidence, it acted arbitrarily or without substantial evidence.

On the whole, the important issue is whether the Company will be allowed (on the above rate base) to earn more than the approved and accepted earnings of 6.34%. Clayton's calculations (Exhibit No. 10) show the Company's earnings will be only 4.57%.

(e) "The Commission Order Is Clearly Unlawful in Limiting the Amount of Municipal Taxes Which May Be Levied Against the Company."

The short answer to the above objection is that the Commission's order does not in any way limit, or tend to limit, the amount of any kind of taxes a city or town may wish to levy. However, there are other objections in this connection which grow out of the situation presently set forth.

As stated in the beginning, the Company requested the Commission to eliminate certain "discriminations" with reference to the taxes levied, in various amounts, by municipalities against customer meters. In attempting to properly and equitably solve this situation, the Commission first divided the municipalities into four groups—A. B. C. and D. based upon features, unnecessary to describe, which grouping we cannot say was arbitrary. It then discovered that the municipal tax charge per meter for the year 1960 within the municipalities so grouped was as follows:

Group A    From 20 cents to $2.34, some levying none
Group B    From 20 cents to $4.28, some levying none
Group C    From 22 cents to $1.12, some levying none
Group D    No tax levied in any municipality.

Based on the above, the Commission properly found that discrimination existed. Properly, because all taxes paid by the Company are paid out of revenues derived from all customers. Thus, customers living in municipalities where no tax, or a small tax, was levied are forced to help pay the taxes levied by other municipalities. Consequently, the Commission, no doubt realizing perfection could not be reached in such a complex situation, by its order permitted the following procedure: In municipalities in Groups A & B, where the tax exceeds $2.00 per meter, the Company can charge the excess to the customer; and in municipalities in Groups C & D, where the tax exceeds $1.00 per meter, the Company can likewise charge the excess to the customer. We are unable to say that the Commission, in so doing, acted arbitrarily or without substantial supporting evidence, or that it acted without authority. The inequities resulting from imposing unequal municipal taxes against a public utility were considered in *City of Newport News* v. *Chesapeake and Potomac Telephone Co.*, 198 Va. 645, 96 S. E. 2d 145 (1957), where the Court, among other things, said:

"The result is a form of taxation without representation, which has aroused historic protest in this country."

See also: *State Ex Rel Pacific Telephone & Telegraph Co.* v. *Department of Public Service*, 19 Wash. 2d 200, 142 P. 2d 498 (1943).

(f) "The Order of the Commission Denying Motion of the City of El Dorado and Approving Escalator Clauses and Increases Thereunder Without Notice or Hearing Is Arbitrary, Unlawful and Not Supported by Any Evidence."

(This point is urged only by the City of El Dorado.)

To understand El Dorado's argument under this final point it is necessary to give a brief history of what led up to the point here considered.

On October 1, 1958, the Company filed what is called Rate Rider 2-58 with the Commission. This was in fact an escalator clause. Generally speaking, it provided for the Company to receive a rate increase or decrease depending on the rise or fall of the price the Company had to pay for gas to be distributed to its customers. No notice was given by the Company or the Commission to any city, rate payer, or the general public. It appears that the Commission never did formally approve the escalator clause but permitted it to become effective by operation of law.

Pursuant to provisions of the escalator clause the Company, on November 1, 1958, filed for an adjustment of its rate in accordance with the claimed increased cost of gas. The Commission authorized the Company to increase the price of gas sold to its customers an additional 3.5 cents per MCF of gas; on November 1, 1959, an increase in the amount of 1.5 cents per MCF was authorized; and, on November 1, 1960, an increase in the amount of 2 cents per MCF was allowed. During this hearing El Dorado strenuously objected to the above procedure, contending that it was irregular and unlawful because no notice had been given and because the Commission did not require the Company to justify the increase.

On October 15, 1961, by direction of the Commission, the Company filed a new escalator clause which was approved by the Commission on the following day. Again, no notice was given and no hearing on the merits was granted. On October 31, 1961, El Dorado filed exceptions to the above procedure but was overruled by the Commission without a hearing.

It is first insisted by El Dorado, ''The Escalator is not authorized by Statute''. We see no merit in this because Ark. Stats. § 73-219 does provide for a ''sliding

scale" or an "automatic adjustment" of rates. The use of escalator clauses as a method of adjusting utility rates without having to resort to long-drawn-out and expensive over-all hearings has been, at least in part, recognized by our Court in the case of *Aluminum Co. of America v. Arkansas Public Service Commission, et al.*, 226 Ark. 343, 289 S. W. 2d 889 (1956), in which it was said that Ark. Stats. § 73-219 "seems to recognize some sort of escalator clause to be possible in some situations". They have frequently been approved by legal writers and courts and Commissions in other jurisdictions. See "Escalator Clauses in Public Utility Rate Schedules", 106 U. Pa. L. Rev. 964 (1958); "Cost Adjustment in Utility Rate Schedules", 13 Vand. L. Rev. 663 (1960); *Cities Service Gas Producing Co.* v. *Federal Power Commission*, 233 Fed. 2d 726 (10 Cir., 1956); *City of Chicago* v. *Illinois Commerce Commission*, 13 Ill. 2d 607, 150 N. E. 2d 776 (1958); and *Mississippi Public Service Commission* v. *Home Telephone Company, Inc.*, 236 Miss. 444, 110 So. 2d 618 (1959).

The pivotal question therefore to be decided is (a) whether or not notice must be given before the escalator clause is filed with the Commission and (b) whether the public must be notified before any raise is allowed by the Commission pursuant to the escalator clause. In an effort to dispel some of the confusion that perhaps prevails, we proceed now to examine some of the pertinent statutes.

First, there is Section 18 of Act 324 of 1935, as amended, set out in Ark. Stats. § 73-217. Without copying this section of the statutes and without discussing it fully, suffice to say that it provides that no utility shall make any change in its existing rates except after 30 days notice to the Commission. It also provides that "the utility shall also give notice of the proposed changes to other interested parties *as the [Department] Commission in its discretion may direct*". (Emphasis supplied.) The above quoted sentence, and especially the emphasized portion, might well be subject to more than one

interpretation. It might be argued that the Commission in its discretion may direct that no notice at all be given to anyone. This is not our interpretation, particularly in view of the provisions of the preceding section of the statutes (73-216) wherein is set out a number of people and organizations who may be interested parties in any rate change, namely: any Chamber of Commerce, Board of Trade, mercantile associations, municipality or any twenty-five public utility users. In our opinion the only discretion the Commission has in this connection is to require the utility to give notice to one or more of the above interested parties. It is important to bear in mind that the procedure under § 73-217 apparently envisions a full scale rate hearing which might well involve many weeks or months of hearing and the expenditure of several thousands of dollars.

Secondly, apparently it was the desire of the legislature to avoid such a lengthy and expensive hearing to make what might be termed minor adjustments. Pursuant thereto the legislature enacted Section 20 of Act 324 of 1935, set out in Ark. Stats. § 73-219 mentioned above. Speaking generally of this section, it appears to provide an abbreviated procedure whereby the utility rates can be raised or lowered depending on one item (or at least a very few items) affecting income or expenses of the utility, such as in the present case where an increase in the utility rate depends on the price the Company is required to pay for the purchased gas for distribution. It will be noted that this section does not require any notice to be given to the general public, either at the time of filing the schedule or subsequently when an adjustment is made pursuant thereto. The section does contain this language, "Nothing in this section shall prevent the Department [Commission] from revoking its approval at any time and fixing other rates and charges for the product or commodity or service, if after reasonable notice and hearing the Department [Commission] finds the existing rates or charges unjust, unreasonable, insufficient or discriminatory". We take this to mean that once the Commission fixes a definite

rate it cannot lower the rate without giving notice to the utility affected, and cannot raise the rate without notifying, in some way, the rate payers.

After carefully studying the various provisions of the statute relative to the question here involved we are unable to see how the interests of the utility customers or the rate payers are in any way prejudiced because of the lack of notice. Ark. Stats. § 73-205 provides, "The utility shall keep copies of such schedules open to public inspection under such rules and regulations and at such places as the Department [Commission] may prescribe". It cannot logically be contended that the rate payers' interest is prejudiced at the time the utility files an escalator clause with the Commission, because at that time no change is made. Likewise, it is difficult to understand why the rate payers would be prejudiced when the Commission, as in this case, increases the utility rate to compensate for an increase in the price of purchased gas. In the first place, when such a raise is effected, that of itself would be notice to the rate payers and they could then ask the Commission to set aside the increase under the provisions of § 73-219 heretofore quoted. In the second place, if long-drawn-out and expensive rate hearings are to be avoided, it does not seem unwise, or prejudicial to the rate payers, for the Commission to pass on the relatively simple question of whether or not there had been an increase in the price of purchased gas. This is not to say, of course, that if any customer or organization feels that to grant this increase in rates would result in the utility earning more than the allowed rate (6.34%), recourse may not be had to a full hearing under the provisions of Ark. Stats. § 73-216.

All of the above reasoning basically stems from the inevitable fact that utility rates cannot be adjusted every few months or every year, otherwise there would be no cessation of such procedure. As has heretofore been said, it is the duty of the Commission to fix a rate of return not for a day or a week but for the foreseeable future.

It is objected by El Dorado that the schedules filed by the Company in this case did not provide, as § 73-219 requires, "for a fixed period". This objection again calls for an interpretation of the statute. The term "fixed period" could refer to the length of time the escalator clause is to remain in effect, or it could refer to the length of time between adjustments. We prefer the latter interpretation for the following reasons. We cannot see that any useful purpose would be served by limiting the time the escalator clause would be in effect, because it could be renewed at any time by the utility filing another one. Also, the Commission has the authority, either on its own motion or on petition, to revoke the escalator clause for good cause. On the other hand, we can readily see good reasons for limiting the time (for instance) an increased rate adjustment (made on the price of gas) should be allowed to remain in force. This is because it may well be assumed that the price of gas can decrease within a year's time. If this situation should arise, then the Commission would have the opportunity to make a re-examination once every year.

It is our conclusion therefore, based on all we have heretofore said, that the judgment of the trial court should be affirmed.

Affirmed.

GEORGE ROSE SMITH, J., not participating.

McFADDIN, J., concurs.

ED. F. McFADDIN, Associate Justice (Concurring). I agree with the Majority that the judgment should be affirmed; but on some points I have arrived at my conclusion by a method of reasoning which is different from that contained in the Majority Opinion; and therefore I concur in the result.

It is unnecessary for me to list the various points of concurrence, but I do mention one. It is Topic Two (f) in the Majority Opinion, which is captioned: "The

Order of the Commission Denying Motion of the City of El Dorado and Approving Escalator Clauses and Increases Thereunder Without Notice or Hearing is Arbitrary, Unlawful and Not Supported by any Evidence.''

This point is urged by the City of El Dorado; and is a challenge, not only on the legality of escalator clauses, but on the procedure that the Arkansas Public Service Commission has employed in allowing escalator clauses to take effect. Escalator clauses are legal; but I am firmly of the opinion that the Commission should not allow any escalator clause to go into effect in any case without first giving notice to all interested parties; and I think this Court should now definitely so hold.

It was shown that without notice the gas rates had been increased by escalator clauses; and I think such procedure was wrong; but the question becomes moot in the case at bar because the increases by escalation were in 1958, 1959, and 1960; and, in the hearing from which comes this appeal, all of these escalation increases were considered; and it was found that the rate allowed by the escalation clauses had not exceeded the allowable rate. All interested parties and municipalities were heard in the present case, and the rate now in effect, even by such escalation clauses, was found to be less than the allowable rate; so the effect of the previous escalation increases in 1958, 1959, and 1960, is really moot.