Mrs. David A. HIBBS et al *v.* ARKANSAS PUBLIC SERVICE COMMISSION et al

5-5615                                471 S.W. 2d 367

Opinion delivered October 11, 1971

*Robert Lee Byrd* of Legal Aid Bureau of Pulaski Co., for appellant.

*Charles W. Baker,* for Arkansas Louisiana Gas Co.; *Benjamin C. McMinn,* for Arkansas Public Service Commission, appellees.

LYLE BROWN, Justice. Appellee, Arkansas Louisiana Gas Company, cut off appellant Hibbs's gas because her check was dishonored for insufficient funds. Appellants filed a complaint with the Arkansas Public Service Commission questioning the validity of the regulation which authorized the cutoff procedure. The action of Arkla was upheld by the commission and by the circuit court on appeal. For reversal appellants contend (1) that the regulation under which Arkla proceeded was never approved according to the standards of the PSC, (2) that the cutoff being without notice and in that respect different from the notice procedure given other delinquent customers, is in violation of the equal protection rights guaranteed by the Constitution, and (3) that a change in the rules to require notice to overdrafters would not work an undue hardship on Arkla.

Appellant Mrs. Hibbs was one of thirty-three persons who signed the original petition addressed to PSC. Mrs. Hibbs obtained the signatures of the other persons, not because they had any unpleasant experiences, but because they were in sympathy with Mrs. Hibbs's problem. All the signers are designated as appellants. The petition, or complaint, was critical of the cutoff regulation for customers giving overdrafts, describing it as being "unreasonable, unjust, damaging, and injurious to the public health (the loss of heating and cooking facilities presents obvious dangers to families, particularly those

with elderly people, children or invalid persons in the household).''

Mrs. Hibbs's cutoff experience occurred in December 1969. We summarize her testimony. The gas bill was delivered the first week in December and she sent the check for the net amount on December 10. She received a pink slip around December 19, showing that a check for $10.00 caused an overdraft. She had written two checks in that amount, one to Arkla and one to J. C. Penney Company. It was not until January 9 that she was able to identify the overdraft check. All her efforts at locating the check were with the bank. She never contacted Arkla or Penney. She said she made a deposit on December 24 to cover any outstanding checks. On December 30 her gas was cut off without notice. Upon her calling the service department a service man was dispatched to her home. She said she was told that the gas was cut off for nonpayment and that she would have to go to the office and pay the bill plus $3.50 connecting fee. This she did and the gas was turned back on that same day. Mrs. Hibbs said she had been a gas customer for some five or six months and had a good paying record except for one month when she was two days late. With regard to the overdraft check she said she had considerable difficulty with the bank in getting the check. The reason she did not call Arkla was that she assumed the check was the one given J. C. Penney because she had no notice from Arkla.

Robert Nease, the office manager in charge of collections and customer contracts in Little Rock, was the only witness for Arkla. The company had 83,000 customers serviced by his office, of which sixty to seventy thousand paid monthly bills by checks. He outlined the procedure for those who fail to pay their bills during any particular month. If no payment is received and the customer has been with the company less than a year, a reminder is sent to that customer. If a delinquent customer ''has been with us for one year and has a good record, we add the balance to the next month's bill. If not then paid then we send a friendly reminder.'' If there is no response to a reminder a service man is sent

to cut off the gas. The procedure for bad checks is different because the computer records payment. Only when the check is returned from the bank is it known to be insufficient. An insufficient funds check is run through the bank a second time. If it is again returned to Arkla a collector is sent to the home with a cutoff order to demand payment. If the party is away from home, or refuses to pay, the cutoff is made. Exceptions are made where sick persons are known to be affected. Mr. Nease interpreted the law as making it fraudulent to give an overdraft. In further explaining why no reminder was sent the customer of an overdraft, he had this to say: "Further, we know the bank sends out a notice where a check has failed for any reason in its first pass through the bank. It takes five days for a second run so there is time for notice to reach the bank customer and for that customer to get in touch with us."

The witness explained that it took three to five days for a check to clear the bank. The rerun of the check, so he said, takes another three to five days. Therefore, he reasoned, the customer has ample time, after notice of the first insufficiency, to make the check good before the cutoff order is issued. He said the company experience had been that twenty to twenty-five checks daily are not honored but that a majority of those checks are honored on a rerun through the bank. Nease said it would be confusing to send notice after the rerun because the mailing of the notice would run into another billing period.

There are two rules pertinent to this appeal. The first is one of the standard rules and regulations of the commission adopted March 8, 1956:

RULE 8.   DISCONTINUANCE OF SERVICE.

A.   For Violation of Rules and Regulations.

No utility shall discontinue service to any customer for violation of its rules or regulations nor for nonpayment of bills, without first having diligently tried to induce the customer to comply with its

rules and regulations, or to pay his bills. Service shall actually be discontinued only after at least five (5) days' written notice shall have been given to the customer by the utility; provided, however, for fraudulent, careless, negligent, or unlawful use of the commodity or service detected, or where a dangerous condition is found to exist on a customer's premises, service may be discontinued without advance notice.

Then on March 28, 1956, Arkla gained approval by the commission of Arkla's standard rules and regulations (tariff), among which is found the following:

IV. DISCONTINUANCE OF SERVICE. (a) The Company reserves the right to shut off the gas at any time and to remove its property from the premises for any of the following reasons: . . . . (k) When checks received from customer for amounts past due or for the required deposit are not honored when presented to the bank for payment, then service may be discontinued without advance notice.

This brings us to consideration of the points for reversal, the first one being that the regulation (tariff) IV was not by the commission approved according to the standards of the PSC. With respect to IV the commission made these findings:

5. Paragraph IV, Sub-heading (a) (k) of the Rules and Regulations of Arkansas Louisiana Gas Company as filed with this Commission provides, inter alia, "that when checks received from customer for amounts past due or for the required deposit are not honored when presented to the bank for payment, then service may be discontinued without advance notice." This part of the rules and regulations of Arkansas Louisiana Gas Company is a valid section of the Rules and Regulations of the Arkansas Louisiana Gas Company and was approved by this commission and is binding on all consumers of gas service of said company.

7. The commission approved the Standard Rules and Regulations of Arkansas Louisiana Gas Company by Order in Docket No. U-1112 which approval had the effect of exempting said utility from the provisions of Rule 8 (A) of the Commission's Rules for the notice requirements before discontinuance of service.

A copy of the order on Docket No. U-1112 is signed by all members of the commission and recites that it was enacted at a session of the commission after conferences with representatives of Arkla and the commission's staff. In their argument under Point I appellants assert that the docket entry in U-1112 does not reflect that Arkla made a showing of hardship which is required before being relieved from conformity with the commission's general rules, such as Rule 8. In the absence of an affirmative showing that the commission acted arbitrarily, we cannot lend merit to appellants' argument. The record in fact shows that the IV (a) (k) was adopted after a series of conferences between the commission, its professional staff, and Arkla representatives. Absent a showing to the contrary we would presume that the merits of the proposed new rules were discussed between the conferees, including the need for relief based on hardship. At least the appellants, being the movants, had the burden of coming forward with proof to the contrary.

In support of Point II—the equal protection argument—it is contended that to give notice to those customers who tender no payment at all, and to give no notice to those who submit insufficient funds checks, is discriminatory. We agree with the statement in Nebbia v. New York, 291 U. S. 502 (1934): "And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." If the testimony of Mr. Nease is to be accepted, which was apparently done by the commission, there was good reason to believe it not unreasonable to place the overdrafters in a separate category. In the ordinary

course of banking they receive notice from the bank between the first and second deposit of the bad check; to give notice after the rerun would ordinarily throw the debt into another billing period, with resulting confusion; and, the giving of the check results in the computer showing the bill paid when in fact it was not. Additionally, it was shown that good results were obtained from rerunning the checks, which was of benefit to both Arkla and to the customer.

The placing of overdrafters in a separate category depends on the reasonableness of the classification as gleaned from the facts. The finding of facts by the commission has the force of a jury verdict. We so held in *City of El Dorado* v. *Arkansas Public Service Comm'n.*, 235 Ark. 812, 362 S. W. 2d 680 (1962). Those findings must stand if based on substantial evidence, free from fraud, and not arbitrary. That is true even though we might disagree with the wisdom of the order. *Ft. Smith* v. *Southwestern Bell Tel. Co.*, 220 Ark. 70, 247 S. W. 2d 474 (1952). Viewed in light of those standards we cannot say the commission's approval of the classification is in error.

Finally, it is contended that to require notice to overdrafters would not work an undue hardship on Arkla. The testimony of the witness Nease was just to the contrary. Further, appellants offered no proof to support the point.

Affirmed.